# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CT-01931-SCT

*PHELAN TERRELL GUICE*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/04/2004 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOSHUA AARON TURNER |
| | MERRIDA COXWELL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FAYE PETERSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/11/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Aggrieved by the his conviction for aggravated assault and sentence of twenty years' imprisonment as a habitual offender, Phelan Terrell Guice appealed to us. This case was assigned to the Court of Appeals, which affirmed the final judgment of conviction and sentence entered by the Circuit Court for the First Judicial District of Hinds County. We

thereafter granted Guice's petition for writ of certiorari. Upon a meticulous review of the record and the applicable law, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     We glean the following facts from the opinion of the Court of Appeals:

> On the evening of September 2, 2001, a person came to the Bolles's residence. Anita Bolles answered the door, and the man at the door asked to speak with her brother, Clarence "Brian" Bolles, Jr. After hearing the doorbell ring, Brian proceeded to go answer the door, not knowing that his sister had already answered it. When Brian reached the door, the visitor pulled out a gun and began shooting. Brian suffered a gunshot wound to the abdomen, while Anita escaped unharmed.
>
> Anita Bolles was able to pick out her brother's assailant from a police photographic line-up. She identified [Phelan Terrell] Guice as the person who came to their house on the evening of September 2, 2001, and shot her brother.
>
> At trial, Guice testified that he did not shoot Brian. He also testified that he was at his grandmother's house in Yazoo City on the evening of the incident. Guice further testified that there were no witnesses who could substantiate his claim that he was out of town when the incident occurred.

***Guice v. State***, 2006 Miss. App. LEXIS 72, *2, ¶¶ 3-5 (Miss. Ct. App. 2006).

¶3.     On April 9, 2002, Phelan Terrell Guice, hardly a stranger to our criminal courts, was indicted for the crime of aggravated assault for shooting one Clarence (Brian) Bolles, Jr. in the stomach with a 9-millimeter handgun. This indictment also charged Guice with being a habitual offender pursuant to the provisions of Miss. Code Ann. § 99-19-81 (Rev. 2000), inasmuch as Guice had prior felony convictions in Yazoo County for possession of stolen property and auto theft. Guice was arraigned on the aggravated assault indictment on October 30, 2002, and he promptly thereafter received court-appointed counsel. On the long

2

road to trial, there were various motions filed by the State, Guice, through counsel, and Guice, pro se. As these motions become relevant during the course of our addressing the relevant issue presented, these motions will be discussed in more detail, but suffice it to state here that in due course, Guice went to trial, with court-appointed counsel, on the aggravated assault indictment.

¶4.     We present here a summary of the evidence presented in the State's case-in-chief. Anita Bolles testified that on the date of the incident, September 2, 2001, she answered the doorbell to find a person she did not know inquiring about her brother, Clarence Bolles, Jr. (who was also known as "Brian"). Not knowing that his sister had already answered the door, Brian appeared, whereupon the stranger asked "Are you Brian," and before Brian could respond, the stranger "pulled out a gun and started shooting," hitting Brian in the abdomen. Later, while at the hospital with her brother, Anita stated to police detectives that, while she did not know the name of the man who shot her brother, she would definitely be able to identify the shooter. A couple of days later, when shown a photographic lineup with six photographs of different men, Anita immediately picked out the photograph of Phelan Terrell Guice as being the person who shot her brother. She likewise identified Guice at trial as the shooter. After pointing out Guice, the prosecutor asked Anita, "Are you absolutely sure that's the man you saw shoot your brother on September 2nd, 2001?" Anita responded, "Yes, I am."

¶5.     Jackson police officer Gregory Robinson, who was one of the officers who investigated this incident, stated that when he arrived at the Bolles' home, the victim had

already left, but the victim's sister (Anita) was still on the scene. Anita described the shooter to Officer Robinson as a "[b]lack male, medium complexion, about 160 pounds." Officer Robinson also recovered shell casings at the scene, and stated that he noticed blood and a bullet hole in the screen door.

¶6. Bryon McIntire, a nine-year employee of the Mississippi Crime Laboratory, was tendered and accepted, without objection, as an expert "in the field of firearms and tool marks." McIntire identified two projectiles offered into evidence as having "class characteristics consistent with a .38 caliber and 9 millimeter caliber."

¶7. William (Will) Gardner, a 25-year JPD employee who worked in the violent crimes division, received a call to travel to the University of Mississippi Medical Center. Upon arrival at the hospital, Officer Gardner talked with Anita Bolles, and then later, made a second trip to the hospital after generating a photograph lineup, which included Guice's photograph. In putting together the photo lineup, Officer Gardner attempted to obtain six photographs of individuals with similar features, such "as facial hair, facial features, anything like that." According to Officer Gardner, when shown the photo lineup, Anita, without any hesitation, picked out Guice as the person who shot her brother.

¶8. Rozerrio Camel, a 12-year JPD employee who also worked in the violent crimes division, traveled to the hospital and retrieved projectile fragments which had been taken from the body of the victim.

¶9.     Lynn Goodwin, a 7-year JPD employee, worked as a crime scene investigator. Officer Goodwin collected evidence at the scene, including shell casings, which she identified as a Winchester 9-millimeter Luger shell.

¶10.    The victim, Clarence (Brian) Bolles, Jr., testified that he did not get a good look at the person who shot him in the abdomen, and that when the person started shooting him, he pushed his sister, Anita, out of the way and slammed the door, and after the door was closed, two more shots came through the door. Brian also informed the jury of his extensive injuries suffered as a result of the gunshot wound.

¶11.    After the State rested and the defendant's motion for a directed verdict was denied, Guice was the only witness who testified in the defendant's case-in-chief. Guice offered up an alibi defense, claiming to have been at his grandmother's house in Yazoo City. Guice expressly denied shooting Brian Bolles. On cross-examination by the State, Guice again stated that on the day and evening of the shooting on September 2nd, which was a Sunday, he was at his grandmother's house, but his grandmother was not present. Guice testified that on Sundays, his grandmother was ordinarily at church from between 8:00 or 9:00 in the morning, until around 10:30 at night. Even though Guice stated that he had been to church with his grandmother on prior occasions, he did not know the name of the church she attended. Guice stated that his aunt and uncle also lived with his grandmother, but they were likewise not at the house while Guice was there on that day. Guice also testified that he had a cousin who knew he was in Yazoo City on that day. Interestingly, Guice did not subpoena

his grandmother, aunt, uncle, or cousin to testify. Guice explained that he did not subpoena any of these relatives because they did not personally know he was in Yazoo City that day.

¶12. After only fifty-five minutes of deliberations, Guice was found guilty by the jury, and, in due course, the trial judge sentenced Guice to twenty years' imprisonment as a habitual offender, pursuant to Miss. Code Ann. § 99-19-81 (Rev. 2000). Guice timely perfected his appeal to this Court, and this case was assigned to the Court of Appeals.

**PROCEEDINGS BEFORE THE COURT OF APPEALS**

¶13. Before the Court of Appeals, Guice, with appellate counsel different than his trial counsel, claimed trial court error in (1) refusing to dismiss his case for violations of his federal and state constitutional rights to a speedy trial, as well as for violation of his statutory right to a speedy trial; (2) refusing to allow Guice to submit an alternate theory of his case to the jury; and, (3) refusing to allow Guice's trial counsel to cross-examine Anita Bolles on this alternate theory that somehow Mario Jones, Anita's ex-boyfriend and the father of her child, had supposedly made threats to the Bolles family, and may have somehow been involved in the shooting of Brian. Guice, through his appellate counsel, likewise claimed on appeal that his trial counsel rendered ineffective assistance by (1) failing to assert his federal and state constitutional and statutory rights to a speedy trial; and, (2) failing to investigate the State's witnesses before trial.

¶14. After addressing these issues, the Court of Appeals, in a unanimous decision (two judges not participating), found these issues to be without merit and thus affirmed the trial court judgment of conviction and sentence. After the Court of Appeals denied his motion for

6

rehearing, Guice filed his petition for writ of certiorari, asserting grounds for this Court's review of the Court of Appeals' decision similar to those asserted by way of assignments of error for consideration by the Court of Appeals.

## DISCUSSION

¶15. We have already set out the issues addressed by the Court of Appeals, and we have likewise stated that virtually the same issues were asserted by Guice in his cert petition.[1] While we have the authority to address all issues raised before the Court of Appeals and addressed by that court, we likewise unquestionably have the authority to "limit the question on review." We do so today. While the issues addressed by the Court of Appeals could have been addressed in a myriad of ways, we do not disagree with the conclusions reached, nor do we find that the Court of Appeals' decision in this case conflicts with any prior decision of the Court of Appeals or this Court, or fails to consider and address a controlling constitutional provision. With this having been said we now restate for clarity in discussion the one issue we have chosen to address upon our grant of certiorari in this case.

---

[1]In his petition for writ of certiorari, Guice, through counsel, asserted that he was denied (1) his sixth amendment right to a speedy trial under both the federal and state constitutions, as well as his statutory right to a speedy trial pursuant to Miss. Code Ann. § 99-17-1 (Rev. 2000); (2) his sixth amendment right to cross-examination as well as his right to present an alternate theory of the case; and, (3) effective assistance of counsel as guaranteed under our federal and state constitutions.

7

**WHETHER THE TRIAL COURT ERRED IN FAILING TO DISMISS GUICE'S INDICTMENT FOR VIOLATION OF MISS. CODE ANN. SECTION 99-17-1.**

¶16. Guice was arraigned on October 30, 2002, and went to trial on May 3, 2004, some five hundred fifty-one (551) days after the date of his arraignment.[2] Our speedy trial statute, Miss. Code Ann. § 99-17-1 (Rev. 2000), states:

> Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.

¶17. With this statute squarely before us, we must return to the procedural history of this case. After Guice received court appointed counsel, his counsel forthwith filed a motion for discovery. On April 22, 2003, Guice filed a pro se motion requesting public records. Of significant import, Guice, on February 5, 2004, filed a pro se motion to dismiss the aggravated assault indictment due to a failure to provide a "fast and speedy trial." On April 20, 2004, Guice, through his court-appointed counsel, filed a motion in limine seeking exclusion of any evidence concerning Anita Bolles's pretrial identification of Guice, as well as Bolles's in-court identification of Guice. On the next day, Guice, through counsel, filed a second motion in limine seeking a prohibition of the State's impeachment of Guice with his prior felony convictions in the event Guice testified at trial. On April 28, 2004, the State filed a motion in limine seeking exclusion of any evidence concerning the criminal history of the victim, Clarence (Brian) Bolles, Jr. The trial court conducted a hearing on April 28,

---

[2]2004 was a leap year; thus, there were 29 days in February.

2004, concerning Guice's motion to exclude Anita Bolles's identification testimony, and on April 29, 2004, the trial court entered an order denying Guice's motion in limine concerning Bolles's identification testimony.

¶18.     On April 30, 2004, three days before the scheduled trial date, Guice's court-appointed counsel, an assistant public defender, filed a motion to withdraw as Guice's attorney.  In this motion, the assistant public defender asserted, inter alia:

> That on April 29, 2004, the Defendant was indicated [sic] he was unsatisfied with counsel and that he wanted another counsel.
>
> That on April 29, 2004 the Defendant also indicated that he did not want any evidence brought out, direct or by cross-examination, that Mario Jones was the assailant rather than Defendant.  There is testimony in the Discovery of numerous threats by Mario Jones to the victim's family and some questions as to identity.  The Defendant has instructed counsel not to use this evidence, which counsel contends is crucial to the Defendant's defense.
>
> Additionally, the Defendant refuses to cooperate with counsel in the preparation of trial, even in the event the Court denies this motion.

¶19.     With this backdrop, it is now critical to set out in detail what occurred when Guice's case was called up for trial on May 3, 2004.  Although the following quote from the record is lengthy, we deem it critical to a complete understanding of what occurred before the trial judge concerning the statutory speedy trial issue.  Here is what occurred before Judge Kidd on the day of trial (for the sake of clarity, we mention here that "Mr. Alexander" is the prosecutor, and "Ms. Harris" and "Mr. Knapp" are the court-appointed attorneys representing Guice):

> THE COURT:  We have two cases set today.  The first is State versus Phelan Guice.  A motion to withdraw has been filed in that matter and a motion in

9

limine has been filed by the State. Let me go ahead and hear both of those matters.

MR. ALEXANDER: Your Honor, I would think that in the best interest of judicial economy we should hear the motion to withdraw first because if they're allowed to withdraw, the other two matters will probably be academic.

THE COURT: We'll hear the motion to withdraw.

MR. KNAPP: Your Honor, if it please the Court. I, along with Greta Harris, represent the defendant, Mr. Guice, and I am relatively new to the case but I am personally aware of the facts that underlie my motion to withdraw.

Ms. Harris was fired, if you will, by the Defendant and, as I understand, the reasons for that was the Defendant was unhappy with Ms. Harris' conduct regarding the pretrial motions that were heard. I would ask that at some point relevant and convenient to the Court that the Defendant himself address this issue.

We filed the motion to withdraw to comply with the rules of professional conduct which say when we're terminated we are obligated to move to withdraw.

THE COURT: I received the motion to withdraw. It was filed on April 30th and I received it this morning. When did the defendant terminate counsel?

MR. KNAPP: Your Honor, may I ask Ms. Harris?

THE COURT: Ms. Harris?

MS. HARRIS: Your Honor, I went over to speak with [Guice] on April 29th and he informed me at that time that he was not satisfied with the way things were conducted at the motion in limine hearings. And just to be clear that I had heard what he had said, I asked Mr. Knapp to go over with me the following day so that he could in fact hear from Mr. Guice.

THE COURT: Okay.

MR. KNAPP: And, Your Honor, we filed this motion pursuant to the rules of professional conduct and we would request that the Court allow the Defendant to express his own reasons for terminating our services at the proper time.

10

More problematic, Your Honor, are Counts 2 and 3 and these are the lawyers' objections and motions. The defendant has instructed us not to use any reference or defense that someone else may have committed this crime. Some of this evidence may very well be hearsay and some may not be, but as you can imagine, it's extremely important and it is primary to the case that if the Defendant says he didn't do it any evidence of -- specifically threats by another party to imply that the other party may have done this crime is crucial to our defense. However, we've been instructed not to pursue that line of questioning or presentation of evidence.

Additionally -- and I speak first-hand at this point in time -- I did indeed on the 30th go over with Ms. Harris and talked to the Defendant myself and we have had no cooperation and were told that we would not have any cooperation from the Defendant.

THE COURT: Cooperation to do what?

MR. KNAPP: To help in the trial because I told the Defendant we may lose these motions and I said if we lose these motions you've got us and we need to get ready for testimony and everything else. And the Defendant at that point in time said he's not going to help us with anything and doesn't want to do anything except to get us off the case.

Your Honor, I speak to the Court from a few years of experience. I've had unhappy clients before and I've had them file motions to terminate before, even on the day of trial, but I've never had them just completely refuse to talk to me. Usually they talk my ear off.

In the event the Court denies our motion -- and I tried to prepare him -- I told him that the Court has authority to deny this motion and we need to be ready anyway. He was not going to prepare for his testimony or anything else.

Of course, Ms. Harris and I have done what we can to prepare for trial today but we are severely undercut by not being able to bring up the most viable defense and this lack of cooperation is not exaggerated. I got mostly nods and not many of them. The only authority I have, Your Honor, are the Rules of Professional Conduct and on this particular rule it says may withdraw, whereas the first rule I cited says shall withdraw.

THE COURT: Shall withdraw for what reason?

11

MR. KNAPP:  If a client terminates you, you shall withdraw.  But what I'm arguing now is a subparagraph of 1.16, Your Honor, that says counsel may withdraw, perhaps an important distinction.  And I rely on the "may withdraw" under Section B-3.  A client insists on pursuing an objective that the lawyers considers repugnant or imprudent.

Well, I don't consider it repugnant, Your Honor, but there is no doubt that this is not a careful, reasoned decision on the part of the client.  I know what imprudent means but I took the liberty of looking it up in the dictionary to make sure that I wasn't getting old and had forgotten it, and it says showing good judgment [sic] in handling practical matters.  I do not believe the Defendant understands the repercussions of the instructions he's given to us and his refusal to help us.

And there's a catch-all under that Rule 1.16 for other good cause and I have no further argument on that point, but I would ask again that the Court allow the client to testify as to why he wanted to terminate us because that's the client's doing.  But we do join in the motion as we are required to under Rule 1.16.  I have no further argument but the second two allegations are indeed problematic, Your Honor, to us giving the Defendant a fair trial.

THE COURT:  Thank you. Mr. Guice.

MR. ALEXANDER:  Your Honor, may we respond prior to Mr. Guice's testimony?

THE COURT: You may.

MR. ALEXANDER:  First of all, Your Honor, the State received this motion on April the 30th at approximately 2:30 on Friday.  We did first receive a verbal notification at about 10 o'clock that morning from Ms. Harris.  She did call me and tell me that she anticipated filing a motion to withdraw.

Today, Mr. Knapp, who told the Court that he just became affiliated with the case very recently but he is familiar with the issue of withdrawing as counsel, he states the reason as the Defendant was unhappy with the performance of his attorney during the pretrial motions.  That is not mentioned per se in the motion that was filed with the Court.

12

What is mentioned per se as the disagreements was that the Defendant has a problem with implicating Mario Jones as the possible assailant and also a problem with them even mentioning Mario Jones at all.

The reason that is important, Your Honor, is that the State has a question as to whether or not those threats made by Mario Jones are relevant at all. If the Court will recall, last week we had a motion in limine that was brought on by the defense and during that motion in limine our witness, Miss Bolles, testified and there was a question asked of Miss Bolles regarding threats that were made at the daycare center and the State objected as to relevance. The Court asked the defense what was the relevance and the defense, Ms. Harris, after attempting to come up with some relevance, then stated: I'll withdraw that question, Your Honor.

It's the State's assertion, Your Honor, that the threats made, if they were made, by Mr. Mario Jones are, first of all, hearsay and there is no hearsay exception that would allow that in because he's not a party to this action.

Secondly, it's irrelevant. The only thing that's relevant is on the day of this crime did Phelan Guice go to the home of the victim and shoot him. Attempting to bring in the name of a third party or showing that some other person threatened the victim or the victim's sister is not relevant to this case. If the State were trying to prove motive and brought that in, then it would become relevant. But as the Court knows and the defense knows, the State does not have to show motive. The only thing we have to show is that he did shoot the victim on that date in the First Judicial District of Hinds County.

It's our argument that based upon their motion in which the Defendant says that he's not allowing them to bring up or to implicate Mario Jones, it's our assertion that Mr. Guice is following the rules of evidence because that information is not relevant. All that would serve to do is to muddy the water and confuse the jury. They have the duty to defend their client but their defense should be that he did not shoot him. I don't know how but that's their job. But they can't do it by bringing irrelevant evidence or hearsay evidence.

The reason that's important, Your Honor, is because if in fact the State is correct on this assumption on the evidence about Mario Jones and what he did or didn't say, if that is deemed irrelevant, then the entire assertion in their motion is moot. Mr. Guice is only saying that they can't bring up stuff, for whatever reason he has, but he's only saying that they can't bring in evidence that's not relevant to this case.

13

THE COURT: Thank you, counsel. Mr. Guice.

MR. KNAPP: Your Honor, may it please the Court. I can address the issues raised by Mr. Alexander if you would like.

THE COURT: You will be given an opportunity to do that. Mr. Guice, a motion has been filed to withdraw. This Court previously appointed Ms. Harris to represent you when you advised the Court that you could not afford to hire an attorney. The Court appointed Ms. Harris since you had a constitutional right to have an attorney if you could not afford one. It is now the Court's understanding that you wish to terminate Ms. Harris' services. Is that correct.

MR. GUICE: Yes, Your Honor.

THE COURT: Why?

MR. GUICE: Well, the main reason is a conflict of interest, Your Honor. I have asked Ms. Harris several times to raise arguments on motions that I have filed, for one, the right to a speedy trial which was violated. I asked her to raise that. She did not raise it. And, Your Honor –

THE COURT: You've asked for a speedy trial. I've reviewed that in the file and you're going to get a speedy trial today. You're going to get a trial, so let's move on.

MR. GUICE: Okay, Your Honor. She did not raise that argument. Then another thing, I do not feel like my lawyers have been loyal to me either. I have been asked by my lawyers several times to enter a plea and if I didn't commit a shooting, she wants to know –

THE COURT: Well, your lawyer has an obligation to discuss any and all plea offers with you so I assume she was doing that. She has an obligation to have those discussions with you. If that offer has been made –

MS. HARRIS: Excuse me, Your Honor. I believe there are some potential witnesses in the courtroom.

THE COURT: Okay. If any witnesses in this case are in the courtroom, you need to step to the witness room. Go ahead.

14

MR. GUICE: Your Honor, my reason for saying this, like I said, I don't think she's been loyal to me. She's supposed to be defending me or helping me to defend myself and if she's to help me defend myself, why is she asking me if we need to accept a plea or anything like that. So I don't feel like she's being loyal to me.

And, as I said, the conflict of interest goes to another thing; not just by the motion being filed for the violation of my rights to a speedy trial. The Lyman (phonetic) motion, or whatever it was that was filed, I don't think it should have been filed and what she was explaining to me, Your Honor, was that my cousin Mario -- to make him look as an enemy in this case. Now, if we were to bring up Mario in this case, it would be to my betterment for him to explain why would the Court suggest that I had something to do with the crime that was committed.

THE COURT: Do you have anything else?

MR. GUICE: I just wanted to talk to you -- I'm so nervous -- I just wanted to talk to you, Judge Kidd, about me and my lawyer have a conflict of interest and I do not feel she's been loyal to me.

THE COURT: So who do you intend to hire to represent you or do you intend to represent yourself?

MR. GUICE: Your Honor, I do not plan on representing myself and at this time *my family is working to come up with the money to provide me with a lawyer and, if not,* then I assume –

THE COURT: *You've had two years to hire a lawyer and you've not done so and you've filed motions asking this Court to dismiss for speedy trial. So certainly you're not asking the Court to delay the trial from today's date, are you, in light of the fact that you want your day in court, you want your speedy trial.*

MR. GUICE: *Your Honor, the thing about the speedy trial, I was not asking for a speedy trial. I was asking for my charges to be dismissed on the grounds of a violation of a speedy trial.*

THE COURT: Well, I'm denying that. But in light of the fact that you filed a motion to dismiss for lack of speedy trial, I assumed you wanted a speedy trial, didn't you?

15

MR. GUICE: Yes, I did.

THE COURT:  Well, I'm going to give you one today.  You're going to get your day in court which you are constitutionally afforded.

You have certain rights for you to come to court and to defend yourself and I'm going to go ahead and give you your day in court today at one.  Do you understand?

MR. GUICE:  Your Honor, will I have to go to court with Ms. Harris representing me?

THE COURT: You will have to go to court with Ms. Harris representing you. The motion to withdraw is denied.  Ms. Harris and Mr. Knapp will represent you at trial because you're not telling this Court that you have anyone else at one o'clock to represent you, do you?

MR. GUICE:  At the time, I do not.

THE COURT: Do you wish to proceed and represent yourself?

MR. GUICE: No.

THE COURT:  Ms. Harris and Mr. Knapp will be your attorneys.  Let me hear the motion in limine.

(emphasis added).

¶20.    When the record is read in its totality, it is obvious that even as of the day of his trial, Guice did not want a speedy trial, and in fact, on his trial date, according to Guice, his family was still working to secure retained counsel for him.  As Guice so candidly stated to Judge Kidd, Guice did not want a speedy trial, he wanted the charges against him "dismissed on the grounds of a violation of a speedy trial."   Human nature being what it is, anyone, when confronted with an unpleasant situation, would hope that "it" would simply go away. Many a defendant charged with a crime has no doubt, "hoped against hope" that a criminal

16

indictment would somehow evaporate in thin air so that he/she would not have to face a jury. Guice was not so much aggrieved by the fact that he had been deprived of a trial; instead, he was more aggrieved by the fact that Judge Kidd would not dismiss his case for supposedly violating the speedy trial statute.

¶21.   Both our federal and state constitutions provide that an accused enjoys the right to a speedy trial.  The Sixth Amendment to the United States Constitution states, inter alia, that "the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  Our state constitution states, inter alia, "the accused shall have a right to . . . a speedy and public trial."  Miss. Const. art. 3, § 26 (1890).  When one reads these federal and state constitutional provisions, there can be absolutely no question that the *accused* in a criminal proceeding has a constitutional right to a speedy trial.  However, Guice requests that we reverse his conviction and discharge him, not only for the violation of a federal or state *constitutional* right, but also for a perceived violation of our speedy trial *statute*.  Again, our speedy trial statute, Miss. Code Ann. § 99-17-1 (Rev. 2000), states:

> Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.

Contrary to our federal and state constitutions, which undeniably afford an accused the right to a speedy trial, we find no such right afforded to an accused under our speedy trial statute. The statute simply states that "all offenses for which indictments are presented" shall be tried within 270 days after "the accused" is arraigned.

17

¶22.    It is argued that absent a showing of good cause and a continuance duly granted by the trial court, the statute provides for a per se discharge of a defendant.  However, we have to ask how a violation of a statute could bring about such a drastic result when a violation of a constitutional provision does not.  If an accused claims a denial of a speedy trial under our federal constitution, the defendant's case is not automatically dismissed simply because a constitutional violation may be shown.  Instead, the trial court, and ultimately the appellate court, must conduct the familiar balancing test under *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972):

> A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc  basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

407 U.S. at 530.  In *Barker* the United States Supreme Court also observed:

> A second difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

*Id.* at 521.

¶23.    We are convinced that Justice Roy Noble Lee got it right in his dissent in *Turner v. State*, 383 So.2d 489 (Miss. 1980), when he stated that the statute did not mandate "a

18

discharge of the accused unless the statute is clearly violated *and* the accused has sustained

prejudice by reason thereof." *Id.* at 491 (Lee, R. N., J., dissenting) (emphasis added). Justice

Lee went further and correctly opined:

> I think that the provisions of the Federal and State constitutions and of Section
> 99-17-1 only require that an accused be discharged in denying him a speedy
> trial which results in prejudice and in the denial of a fair trial to him. Except
> for those reasons, I do not think an accused should be discharged and I do not
> think the legislature intended otherwise.

*Id.* at 492. Sixteen years later, in *Walton v. State*, 678 So.2d 645 (Miss. 1996), this Court

adopted Justice Lee's reasoning and, in the end, concluded:

> There is substantial evidence of the congested trial docket in Marshall County
> which would support the trial court's "good cause" finding. Walton waived
> his right to complain about not being tried within 270 days, because he neither
> requested nor asserted his right to a speedy trial or objected to a delay and
> prejudice has not been shown by Walton.

*Id.* at 650.

¶24.    Delving a little more into the facts of *Walton*, the defendant was put to trial 370-days

after arraignment, which was 100-days beyond the time limit provided by the statute;

however, until the day before trial commenced, the defendant had never demanded his right

to a speedy trial under the statute, nor moved to dismiss for failure to provide a statutory

speedy trial. Although we cited several reasons for affirming the trial court's refusal to

dismiss under the speedy trial statute, we stated, inter alia:

> Walton never raised the speedy trial issue within the time frame prescribed by
> the statute. Walton never filed a demand for speedy trial until November 14,
> 1989, the day his case was set for trial. A one-day continuance was given the
> State to secure the attendance and testimony of Charles Moore, a material
> State's witness. Trial was conducted the very next day, November 15, 1989.

19

The very first time the State was called upon to make a showing of "good cause" was in their response to the Motion for New Trial. The State promptly filed a report of the enormous criminal caseload handled during the applicable terms of the Marshall County Circuit Court, and as previously noted, the trial judge accepted the congested trial docket as "good cause" shown. Should Walton, out on bond this entire period of time, sitting idly by without filing a speedy trial demand until the day of trial, be allowed to "sandbag" the trial court? We do not believe this is what the legislature contemplated under § 99-17-l, nor what this Court intended either.

¶25. This Court in **State v. Davis**, 382 So. 2d 1095, 1098 (Miss. 1980) stated:

In 57 A.L.R. 2d 303, 306, Waiver or Loss of Accused Right to Speedy Trial (1958), appears the following:

A majority of the cases hold that by failing to demand a trial, or by failing to make some effort to procure a speedier trial than that actually accorded to him by the state, accused waives his right to trial within the period prescribed by the statute, this being particularly true when accused is on bail. And it has been expressly pointed out that a failure to demand trial within the period prescribed by the statute will defeat a motion for discharge even though the statute does not expressly make such demand a requirement. And in the absence of an affirmative request or demand for trial it will be presumed that defendant acquiesced in the delay.

678 So. 2d at 649-50.

¶26. In considering what we said in **Walton**, we return to the relevant facts of today's case.

On February 5, 2004, some four hundred sixty three (463) days after arraignment, and eighty-eight days before his trial commenced, Guice for the first time "complained" about his lack of a speedy trial when he filed his pro se motion to dismiss for failure to provide a speedy trial. We must remember that, as correctly pointed out by the Court of Appeals in today's case, "a demand for dismissal for violation of the right to a speedy trial is not the equivalent of a demand for a speedy trial." **Guice**, 2006 Miss. App. LEXIS 72, *7, ¶13 (citing **Perry**

20

*v. State*, 637 So.2d 871, 875 (Miss. 1994)). While we readily acknowledge that defendants have no obligation to put themselves to trial, and that the State no doubt is shouldered with the responsibility of bringing defendants to trial after indictment, a defendant does have some responsibility in asserting the right to a speedy trial. *Taylor v. State*, 672 So.2d 1246, 1261 (Miss. 1996) (citing *Wiley v. State*, 582 So.2d 1008, 1012 (Miss. 1991); *Flores v. State*, 574 So.2d 1314, 1323 (Miss. 1990)).[3]

¶27.   Analogous to today's case is this Court's decision in *Jones v. State*, 776 So.2d 643 (Miss. 2000). In *Jones*, the defendant, in his appellate brief, set out a time line from the date of arraignment until his trial date, and asserted that there was a passage of time of nine hundred seventy-five (975) days, with 709 days being classified by the defendant as the total days of "non-defense delay." *Id.* at 649. However, the only information actually revealed in the record (as opposed to the appellate briefs), was certain trial court clerk docket sheet information that continuances were granted on certain dates. *Id.* We noted that this general information on the clerk's docket sheet did not reveal the length of the continuances or who requested the continuances, nor did the docket sheet reveal any motions for continuance or orders of continuance. *Id.* With this in mind, we stated:

---

[3]While *Taylor*, *Perry*, *Wiley* and *Flores* all discussed the constitutional speedy trial issue in weighing the *Barker* factors, we conclude that "the demand for dismissal for not providing a speedy trial vs. the demand for a speedy trial" distinction is applicable to our discussion of the statutory speedy trial issue. In other words, whether the discussion of an issue concerning denial of a speedy trial is focused on a constitutional violation or a statutory violation, we see a difference in a defendant demanding a speedy trial as opposed to demanding a dismissal for failure to provide a speedy trial.

21

> This Court has repeatedly held that "[we] will not consider matters which are outside the record and must confine [ourselves] to what actually does appear in the record." ***Medina v. State***, 688 So. 2d 727, 732 (Miss. 1996) (citing ***Robinson v. State***, 662 So. 2d 1100, 1104 (Miss. 1995). "We can not decide an issue based on assertions in the briefs alone; rather, issues must be proven by the record." ***Medina v. State***, 688 So. 2d at 732. Furthermore, Jones has failed to show any prejudice which might have resulted from the delay. *See* ***Walton v. State***, 678 So. 2d 645, 650 (Miss. 1996). Without such information, we are unable to find a constitutional or statutory violation of the right to a speedy trial. Therefore, we decline to address this issue.

***Jones***, 776 So.2d at 649.

¶28.    We note that in ***Jones***, we once again stated, consistent with ***Walton***, that in raising statutory speedy trial issues, defendants must attempt to show any resulting prejudice due to the delay in trial. However, on the other hand, contrary to ***Jones***, we have proceeded today to address the merits of this issue in order to make it abundantly clear that while the State shoulders the burden of putting defendants to trial, on the other hand, defendants, while endowed with numerous constitutional and statutory rights, cannot in certain situations supinely wait to be impaled with all of these rights.  As we stated in ***Walton***, a defendant may effectively waive his right to complain of not being tried within the 270-day period set out in Miss. Code Ann. § 99-17-1, when the defendant does not request or assert his right to a speedy trial or object to a delay, especially when the defendant fails to show any prejudice in the failure to be tried within the statutory 270-day period. ***Walton***, 678 So.2d at 650.  To this day, Guice has yet to assert his right to a speedy trial, and it was not until 463 days after his arraignment that Guice, for the first time via a motion to dismiss, complained of not being put to trial timely.  In fact, even on his trial date, which was 551 days after his arraignment,

22

Guice told Judge Kidd that he was not asking for a speedy trial, but he "was asking for my charges to be dismissed on the grounds of a violation of a speedy trial."

¶29. If we were to dismiss the indictment against Guice on the record in today's case, we would, in one fell swoop, overrule a line of cases by declaring that Guice, a man who most assuredly did not want a speedy trial, has the inalienable right to have his case dismissed because the State, nor the trial court, explained the reason for the delay in his being put to trial.

¶30. We encourage our trial judges, when confronted with constitutional and/or statutory speedy trial issues, to make a detailed record on the procedural history of the case under discussion, such as date of arrest, date of arraignment, eventual trial date, reasons for delay, and the like. This is no doubt of great benefit to the appellate court, whether it be the Court of Appeals or the Supreme Court. Without question, it would have helped in this case. For the reasons already stated, we see no reason to engage in speculation as to what caused the delays in today's case, but a fair reading of the record in this case certainly creates fairly strong inferences that at least part of the delay was caused by Guice's obstinate refusal to cooperate with his court-appointed attorneys. As one of Guice's attorneys stated to Judge Kidd, he had dealt with unhappy clients (defendants) before, "but I've never had them just completely refuse to talk to me. Usually they talk my ear off." In the end, Guice would not even talk to his lawyers. One problem was that, rightly or wrongly, Guice's court-appointed counsel wanted to drag Guice's cousin, Mario Jones, into the case in an effort to divert attention away from Guice and on Jones. In other words, defense counsel wanted to assert

23

that Jones was the assailant and not Guice. However, Guice did not agree with the defense theory, plus Guice felt his court-appointed attorneys were selling him out by talking to him about a possible plea agreement. Again, even as late as the day of trial, Guice unequivocally told Judge Kidd that he was not asking for a speedy trial and that his family was "working to come up with the money to provide me with a lawyer."

¶31. While we find that there was a violation of the speedy trial statute, the trial court did not err in refusing to dismiss Guice's indictment for this statutory violation, nor did the Court of Appeals commit error in affirming the trial court on this issue.

## CONCLUSION

¶32. Thus, for the reasons stated, we affirm the judgments of the Court of Appeals and the trial court.

¶33. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. CONVICTION OF AGGRAVATED ASSAULT WITH A WEAPON AND SENTENCE OF TWENTY (20) YEARS, AS AN HABITUAL OFFENDER, WITHOUT PAROLE, PROBATION, REDUCTION OR SUSPENSION OF SENTENCE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND RANDOLPH, JJ., CONCUR. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES AND DICKINSON, JJ.**

**DIAZ, JUSTICE, DISSENTING:**

¶34. I am compelled to dissent because the majority ignores the unambiguous pronouncement of our Legislature, entangles state and federal law, and ignores the binding precedent of the United States Supreme Court. This has resulted in a miscarriage of justice for not only Phelan Terrell Guice, but all Mississippians. This case presents a question

which we have addressed many times before: at what point is the statute providing that criminal defendants be tried within 270 days after arraignment violated? Because we should return to a faithful interpretation of the statute, and because the right to a speedy trial cannot be waived through inaction, the judgments of the circuit court and the Court of Appeals should be reversed.

¶35. Although the majority spends a great deal of time reciting the facts underlying Mr. Guice's arrest and ultimate conviction, the issue of compliance with the 270-day, legislatively-mandated time frame is dispositive; the relevant facts are only those relating to his unlawful and unconstitutional deprivation of a speedy trial. Before analyzing the case at hand, a review of the right to a speedy trial is necessary to clarify the majority's confusion of the law.

**I. The Speedy Trial.**

¶36. In Mississippi, the right to a speedy trial is guaranteed under the authority of both the federal and state constitutions. The United States Constitution mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. The Mississippi Constitution similarly requires that "[i]n all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed" be granted a criminal defendant. Miss. Const. of 1890, Art. 3, § 26.

25

**The Constitutional Right to a Speedy Trial under the Sixth Amendment.**

¶37.    In *Klopfer v. North Carolina*, the United States Supreme Court pronounced the right to a speedy trial "fundamental," and that it applied to the states via the Fourteenth Amendment.  386 U.S. 213, 222, 87 S.Ct. 988, 18 L.Ed. 2d 1 (1967).  The Court traced the origin of a speedy trial to the Assize of Clarendon, an act crafted during the rule of King Henry II in 1166, and to Magna Carta, that English document of freedoms adopted in 1215. *Id.* at 223-24.

¶38.    Yet what exactly constituted a "speedy" trial under the federal constitution was not concretely defined until a few years later, in the case of *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).  Because the U.S. Constitution does not define the term, the Court found the right difficult to quantify:  "the right to speedy trial is a more vague concept than other procedural rights" because "[i]t is, for example, impossible to determine with precision when the right has been denied." *Id.* at 521.

¶39.    Ultimately the Court chose a balancing test where it "identif[ied] four . . . factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530.  This landmark test, with some elaboration, is still utilized today in analyzing constitutional speedy trial violations.  *See Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed. 2d 520 (1992) (the "four separate enquiries" are "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result").

26

¶40.    While understanding that "such a ruling would have the virtue of clarifying when the right is infringed and of simplifying courts' application of it," the **Barker** Court explicitly declined to adopt a "fixed point" at which a speedy trial would be violated.  407 U.S. at 523. The Court did note that "some legislatures have enacted laws, and some courts have adopted procedural rules which more narrowly define the right."  *Id.*  In holding it could not craft such a fixed point, the Court stated that:

> [Adopting a fixed point] would require this Court to engage in legislative or rulemaking activity, rather than in the adjudicative process to which we should confine our efforts. We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The States, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise.

*Id.* at 523.

¶41.    This invitation was heeded by many states as well as the United States Congress, which adopted the Federal Speedy Trial Act of 1974.  The Speedy Trial Act contains a lengthy list of deadlines and details in order to create a precise scheme not inherent in the vagueness of the Sixth Amendment.  *See* 18 U.S.C.S. § 3162.  Congress explained that the Act was "[t]o assist in reducing crime and the danger of recidivism by requiring speedy trials and by strengthening the supervision over persons released pending trial, and for other purposes." 93 P.L. 619.

**The State Right from 1817 to 1975.**

¶42.    From its birth, Mississippi guaranteed speedy trials for its citizens; the language in our constitution today has barely changed since July 17, 1817, when we became a state.  *See*

27

Miss. Const. of 1817, Art. I, § 10 ("in all prosecutions by indictment or information, a speedy public trial, by an impartial jury of the county"); Miss. Const. of 1832, Art. I, § 10 ("in all prosecutions, by indictment or information, a speedy and public trial by an impartial jury of the county where the offence was committed"); Miss. Const. of 1868, Art. I, § 7 ("in all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed").

¶43.   In 1857 our Legislature first codified a statutory definition of "speedy trial": "All indictments shall be triable at the first term, unless good cause be shown for a continuance." Miss. Code of 1857, Section LIX, Art. 285.  That language was modified in 1892 to read "shall be tried," and this remained the law until 1976.  Miss. Code of 1892, § 1421.  This was a strict standard because terms of court were governed by statute, and so each judicial district had its own time period in which to provide a speedy trial.  This provided a flexible standard according to population.

¶44.   For example, in 1942 there were six terms of court in the first district of Hinds County, each lasting 36 days, starting on the first Mondays of January, March, May, July, September, and November.  1942 Miss. Laws, § 1401.  So if a defendant was arrested in June, the "first term" following is the July term of 36 days.  Assuming the person was arrested on June 1, the State was responsible for trying that person within 66 days.  Provided, of course, that there was no continuance, that date was roughly the maximum in that part of the state.

¶45.   Terms of court per judicial district varied.  While the first judicial district of Hinds,

28

a large district in general and also the seat of state government, had six terms of court for 36 days, Grenada County only had two: "On the fourth Monday of January and July, twelve days [each]." 1942 Miss. Laws, § 1399. Those terms were then roughly the end of the month of January and July. Accordingly, in that county, a speedy trial for a criminal defendant might be required within roughly 170 days.

¶46. One of the concerns of criminal defendants in the Mississippi of times past was not the deprivation of a speedy trial, but in receiving too speedy of a trial. As the Supreme Court noted in *Barker*, "deprivation of the right [to a speedy trial] may work to the accused's advantage." 407 U.S. at 521. The reason given that "[d]elay is not an uncommon defense tactic" because "[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade," and "[i]f the witnesses support the prosecution, its case will be weakened, sometimes seriously so." *Id.* Of course, delay can be a two-edged sword, as those witnesses testifying for the defense are also subject to unavailability or a gradual fading of memory. *See generally Doggett*, 505 U.S. at 656 ("though time can tilt the case against either side . . . one cannot generally be sure which of them it has prejudiced more severely") (internal citations omitted).

¶47. In the case of *Robinson v. State* we examined a case that demonstrated the concern over a very speedy trial. The defendant was accused of a rape that occurred on Saturday, July 10, 1954. 223 Miss. 70, 77, 77 So. 2d 265, 267 (1955). He was arrested on Sunday, July 11; indicted on Monday; July 12; and filed a motion on Tuesday, July 13, for a continuance of the trial. *Id.* at 77, 77 So.2d at 267. The motion was overruled, and the

29

defendant tried that Friday, July 16, where he was sentenced to death. *Id.* Only six days elapsed from the attack to the sentencing.

¶48.    On appeal, his counsel argued that the continuance should have been granted in order to allow more time for the preparation of the defense; we concluded that the trial was properly held in accordance with our speedy trial laws, i.e. within the term of court, and that the continuance had been improperly requested. *Id.* at 79, 77 So.2d at 268. Accordingly, we affirmed the penalty of death. *Id.* at 82, 77 So.2d at 269.

¶49.    Earlier that year we had addressed concerns over a trial that was held 14 days after indictment and dismissed them, citing multiple other jurisdictions that had held trials of even shorter time periods—including trials that were held three, two, and even one day after arrest. *Gallego v. State*, 222 Miss. 719, 737-38, 77 So. 2d 321, 329-30 (1955) (examining, among other cases *Commonwealth v. Donnelly*, 86 Pa. Super. 427, 428 (Pa. Super. Ct. 1925), where a defendant was tried and convicted of a crime committed the day before). The ultra-speedy trials in *Robinson* and *Gallego* were simply a part of the culture at that time.[4]

**The State Right in Modern Times.**

¶50.    In 1976 the Legislature altered the statutory right to a speedy trial considerably. Gone were fluctuating dates based upon terms of court, replaced instead by a uniform standard: "Unless good cause be shown, and a continuance duly granted by the court, all offenses for

---

[4]Opinions on ultra-speedy trials passed into the cultural lexicon, particularly in one song lamenting barely a week between arrest and sentencing. *See* Johnny Cash, "I Got Stripes," on *At Folsom Prison* (Columbia Records 1968).

which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Miss. Code Ann. § 99-17-1 (Rev. 2000). Made effective on July 1, 1976, the statute set out a crystal-clear rule: defendants were required to be tried with 270 days after arraignment unless a continuance based upon good cause was granted by the trial court.[5]

¶51. We first examined the statute roughly two years later, in ***Payne v. State***, 363 So. 2d 278 (Miss. 1978). In examining the law, we pronounced that "[t]his statute is plain and unambiguous." *Id.* at 279. The indictment in that case was entered on August 16, 1976, and the defendant was not tried until August 31, 1977—well over a year later. *Id.* at 278.

¶52. Because "[i]t [was] readily seen that the accused was tried and convicted more than 270 days after his arraignment and plea of not guilty," we held that "[t]he only question remains is whether or not the delay comes within the framework of the exceptions in the statute." *Id.* at 279. While a continuance had been sought and granted on behalf of the

[5] The latest available data from the Bureau of Justice Statistics, a part of the United States Department of Justice, indicates that 270 days is ample time between time of arraignment and sentencing for felonies. In a survey compiling data from all state courts, the median time between arrest and sentencing for persons accused of a felony is 153 days. *Felony Sentences in State Courts, 2000*, NCJ 198821, at 9 tbl. 11, June 2003. For violent offenses that number rises to 186 days. *Id.* In the case of aggravated assault, the crime for which Mr. Guice was convicted, the median number of days between arrest and conviction is 163 days. *Id.* Eighty-four percent of all offenses were disposed of within one year. *Id.*

These numbers are similar to the Department of Justice's study of data taken from 75 large urban counties in the United States. In that report, it was shown that the median time for all offenses between arrest to adjudication was 92 days. *Felony Defendants in Large Urban Counties, 2000*, NCJ 202021, at 23 tbl. 22, December 2003. For violent offenses that number rose to 128 days, and for assault the time was 120 days. *Id.* Eighty-six percent of all offenses were disposed of within one year. *Id.*

defendant, there was no other evidence in the record of a continuance; therefore, a unanimous Court reversed the conviction and ordered the defendant released. *Id.*

¶53. The next year we again addressed the statute, this time in a case where we found that "[a]lthough defendant was tried 584 days after his arraignment, he was tried within the time fixed by section 99-17-1 because good reason was shown for the delay." ***Durham v. State***, 377 So. 2d 909, 910 (Miss. 1979). We looked closely at the terms of court in Leake County, finding that one was devoted to civil cases, in another counsel for the defendant was not present, in yet another the defendant requested a continuance for trial preparation, and last, a material witness was absent in another term. *Id.* at 910. Examining these reasons we unanimously found "good cause was shown for the delay in the trial of the defendant and his constitutional right to a speedy trial was not violated." *Id.*

¶54. Our unanimity in interpretation did not last. The case of ***Turner v. State*** garnered two spirited dissents that refused to join the majority in releasing a defendant tried long after the 270 days. 383 So. 2d 489 (Miss. 1980). In dissent, Justice Roy Noble Lee, joined by Justices Walker and Bowling, argued that he would "only require that an accused be discharged in denying him a speedy trial which results in prejudice and in the denial of a fair trial to him." *Id.* at 492 (Lee, J., dissenting). While the Legislature demanded that a trial "shall" be within 270 days, it did not specify the remedy for the State's failure to comply. Justice Lee reasoned that "if the legislature had intended a discharge for failure to comply with the statute, that intent would have been expressed in the present statute." *Id.* (Lee, J., dissenting).

32

¶55.   A mere seven days after we delivered the opinion in *Turner*, we addressed the statute again in *State v. Davis*, 382 So. 2d 1095 (Miss. 1980).   At this point our analysis of the statutory right under Mississippi law became hopelessly tangled with the federal constitutional right.   Despite the fact that the United States Supreme Court's opinion in *Barker* rested squarely on interpreting the Constitution, which had no fixed point for speedy trial analysis, we imported its balancing test and applied it to the statute we formerly held was "plain and unambiguous."   *Id.* at 1097-98.

¶56.   After that point various interpretations of the statute would arise, at times provoking increasingly complex and spirited debates between the majority opinion and dissenting justices, such as in the notable case of *Winder v. State*, 640 So. 2d 893 (Miss. 1994), which generated lengthy dissents by Justices Sullivan and Banks.

**The Modern Interpretation.**

¶57.   The critical turning point in our modern interpretation of the statute is *Walton v. State*, 678 So. 2d 645 (Miss. 1996).   In that case a defendant was tried long after the 270 days had elapsed; there had only been a one-day continuance in the trial.   *Id.* at 646-67.   Although the State had not requested any other continuance, "the State asks us to '(a)ssume . . . that each of the orders setting trial were "continuances" for good cause' and to 'treat each order [setting trial] as a continuance.'" *Id.* at 648.   Despite the plain language of the statute, we did make that assumption.   Further, we found that:

> The reasoning of Justice Lee's dissent in *Turner v. State* . . . is most
> persuasive regarding whether a case is dismissible when tried past the
> allotted 270 days. As stated by Justice Lee in *Turner*, "I think that the

33

provisions of the Federal and State Constitutions and of Section 99-17-1 only require that an accused be discharged in denying him a speedy trial which results in prejudice and in denial of a fair trial to him." . . . Accordingly, in the absence of a showing of prejudice to Walton's right to a fair trial by a delay beyond the 270 days, Walton's case should not be dismissed with prejudice.

*Id.* at 650.

¶58. Thus we deviated materially from the "plain and unambiguous" language of the statute in two ways. First, we allowed a case to be tried long after the 270 deadline had elapsed without virtue of a continuance based on good cause. Second, we judicially grafted the federal constitutional concept of "prejudice" into the plain and unambiguous language of our state statutory right.

**A Strict Interpretation of the Statute is Required by Law and Precedent.**

¶59. It is imperative that we return to strict compliance with the 270-day statute and overrule the line of cases that stray from the plain and unambiguous language crafted by the Legislature. The statute requires that "all offenses . . . *shall* be tried no later than two hundred seventy (270) days after the accused has been arraigned." Miss. Code Ann. § 99-17-1 (emphasis added). There is no exception for a showing of "prejudice," nor does that word appear anywhere in the statute; this part of the law has been crafted wholly by the justices of this Court. There is only one way around the 270-day rule, and this path has two components: first, "good cause [must] be shown, and a continuance duly granted by the court." Miss. Code Ann. § 99-17-1. The 270 days can thus be extended, but only if a continuance is requested of and granted by the trial court, predicated upon a finding of good

34

cause for the delay.

¶60.    It is not simply judicial restraint and a respect for the enactments of the Legislature that drives this reasoning.  The well-settled rule is that criminal statutes must be strictly construed in favor of the accused.  *See United States v. Enmons*, 410 U.S. 396, 411, 93 S. Ct. 1007, 35 L. Ed. 2d 379 (1973) ("a criminal statute . . . must be strictly construed, and any ambiguity must be resolved in favor of lenity"); *State v. Burnham*, 546 So. 2d 690, 692 (Miss. 1989) ("statutes imposing criminal penalties must be construed strictly in favor of the accused, a proposition which may not be doubted").  This is the plain and unambiguous rule as set by the Legislature, and we are bound to follow it "because of our constitutional mandate to faithfully apply the provisions of constitutionally enacted legislation." *Univ. of Miss. Med. Ctr. v. Easterling*, 928 So. 2d 815, 820 (Miss. 2006).

¶61.    It is not the purpose of this Court to craft legislation.  We have ruled repeatedly in recent civil cases that we will faithfully apply the language of the statutes in question so long as they are constitutional.  *See Pitalo v. GPCHP-GP, Inc.*, 933 So. 2d 927 (Miss. 2006) (requiring strict compliance with Section 15-1-36 (15), which requires a 60-day notice be provided to medical providers prior to suit); *Easterling*, 928 So. 2d at 819-20 (requiring strict compliance with Section 11-46-11(1), which requires 90 days notice prior to suit against a governmental entity).

¶62.    We should also abandon caselaw which has unnecessarily intertwined federal law and our interpretation of a state statute.  Simply put, *Barker* has absolutely no application to the interpretation of our state 270 day speedy trial statute, nor does it have application to Art. 1

35

§ 26 of our state constitution. The Legislature has seen fit to define exactly what "speedy trial" means via the statute. The *Barker* analysis is to be reserved only in determining if there was a speedy trial violation under the Sixth Amendment.

¶63. The proper inquiry first determines if there was compliance with the 270-day legislatively-mandated time frame, for that statute is far more restrictive on the State than the federal constitutional right to a speedy trial. Thus, any inquiry into a violation of the right to a speedy trial must necessarily begin with an analysis of our state statutory right, as the State has the right to craft laws so long as they are not in violation of the minimum standards set by the federal constitution.

¶64. For example, a defendant's speedy trial rights under the statute may be violated in cases where his constitutional right to a speedy trial is not. Under the proper interpretation of state law, the rights of this hypothetical defendant are violated if he is tried 300 days after indictment, provided there are no continuances. At the same time, this might possibly not constitute a violation of his federal constitutional speedy trial right as analyzed under *Barker*.

¶65. If and when that analysis determines that a defendant has not suffered a speedy trial violation, the *Barker* review of the Sixth Amendment right is proper. Ultimately, "[t]he state bears the burden of bringing to trial one charged with crime within the time prescribed by statute or showing good reason for failure to comply with the statute." *Turner*, 383 So. 2d at 491.

¶66. This approach allows a clear distinction between the analysis of the state statutory right to a speedy trial from an analysis of the federal constitutional right. An analysis of the

36

statutory right requires that this Court adhere to our constitutional duty to faithfully apply the law as promulgated by the Legislature, regardless of our view of the wisdom of that law. On the other hand, an analysis of the federal constitutional right under the **Barker** case allows this Court to exercise its discretion to determine if constitutional rights have been violated without the benefit of the guidance provided by clearly worded statutes. That is to say, an appellate court must necessarily come to its own conclusion of what is meant by the term "speedy trial" as it applies to the federal constitutional right. No such interpretation is necessary for an appellate court to apply the number "270," because it applies without interpretation, and subject only to the sole exception chosen by the Legislature and included in the statute.

**The Need to Improve Our Criminal Justice System.**

¶67.    In adhering to a faithful interpretation of the statute, we not only fulfill our proper role under the state constitution–we also safeguard our society from the plague of crime and injustice. The right to a speedy trial belongs not only to the accused–it also benefits society. As one commentator has expressed, the "quick adjudication of criminal cases both protects the defendant and preserves society's right to remove convicted criminals from the street. If this decision forces the government to work faster and with more diligence to accomplish these ends, society is the ultimate winner." Daniel A. Conforti, *Note:*   Doggett v. United States: *Breathing New Life Into the Right to a Speedy Trial*, 21 W. St. U.L. Rev. 619, 635 (1994).

¶68.    Our Court has recently struggled to assist in improving the criminal justice system of

37

Hinds County, where Mr. Guice was indicted and tried far in excess of the statutory requirement. In a letter sent in February of this year to the governor, Hinds County's four circuit judges, district attorney, public defender, supervisors, and Jackson city officials, Chief Justice Smith declared that "'[t]he overall condition of the Hinds County criminal justice system is deplorable, unacceptable and in need of a major overhaul.'" Jimmie E. Gates, *Smith Wants Judges to Delay Civil Cases, Work Through Inmate Backlog*, Clarion-Ledger, Feb. 21, 2006, at 1A. Speaking to the editorial board of the Clarion-Ledger, the Chief Justice related his belief that "there's no excuse for people charged with serious crimes to be walking free awaiting trial, or arrested criminal suspects to be turned away from the jail due to lack of space, or for inmates in jail to wait months, even years, without trial, some without even being formally charged with a crime." Editorial, *Hinds Justice: High Court Should Step in to Fix It*, Clarion-Ledger, Feb. 22, 2006 at 6A.

¶69. Recently the sheriff of Hinds County announced that the county was "in a crisis" and deemed the need for reform in Hinds County "an emergency." Leah Rupp, *Ideas Few for Officials Weighing Jail 'Crisis*,' Clarion-Ledger, December 20, 2006, at 1B. And another commentator lamented the failures of our Court to enforce the clearly written words of the statute: "The legislature's speedy trial law . . . was passed to protect the general public and make sure our criminal justice officials are held accountable." Wyatt Emmerich, Editorial, Northside Sun, Sept. 7, 2006, at 4A.

¶70. Yet today, instead of working to improve this system of justice, we damage it even further. In doing so, the majority shrinks from our constitutional role in applying statutes as

written, and more gravely, from our duty to safeguard the constitution and laws of the state of Mississippi. Whatever the condition of the criminal justice system in Hinds County, with today's decision we callously ignore the concerns of society and our constitutional mandate.

## II. Waiver of the Right to a Speedy Trial.

¶71. The majority today refuses to apply binding precedent regarding how and when a defendant may waive his right to a speedy trial. The Court of Appeals previously held in this case that "even though a clear violation of section 99-17-1 occurred, we hold, based on the authority of *Walton v. State* . . . that Guice waived his right to complain about the denial of his statutory right to a speedy trial because he did not assert his right to a speedy trial until well after the deadline has passed." 2006 Miss. App. LEXIS at *11-12.

¶72. We began to allow the idea that a defendant might waive the right to a speedy trial through inaction in *State v. Davis*, 382 So. 2d at 1098, which was quoted with approval in *Walton v. State*, 678 So. 2d 645, 649 (Miss. 1996), the case upon which the Court of Appeals relies. However, *Barker* made it completely clear that a defendant cannot waive her right to a speedy trial under the Sixth Amendment of the U.S. Constitution: "We reject, therefore, the rule that a defendant who fails to demand a speedy trial forever waives his right." 407 U.S. at 528. The Court clarified that "[t]his does not mean, however, that the defendant has no responsibility to assert his right, but that "the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." *Id.* at 528-29.

¶73. The reasoning in *Davis* and **Walton** was based upon an ALR article from 1958—14

39

years before ***Barker*** forbade waiver. It is unclear whether these cases were referring to the state or federal right, but that is unimportant: while states may craft laws and constitutions granting more freedom than is afforded under the U.S. Constitution, they cannot do less. The U.S. Supreme Court has determined that a constitutional right to a speedy trial may not be waived through inaction, and to the extent ***Davis*** and ***Walton*** contradict binding U.S. Supreme Court authority regarding the Sixth Amendment right, they must be overruled. This approach does not eliminate the possibility that a defendant may waive his or her right to a speedy trial through affirmative action, but simply that such a crucial right may not be waived by inaction.

**The Case at Hand.**

¶74.    Mr. Guice was held over thirty-one months between his arraignment and trial, from September 14, 2001, to May 3, 2004. 2006 Miss. App. LEXIS 72, *3 (Miss. Ct. App. 2006). He brought the 270 day issue before the Hinds County Circuit Court in his own handwritten motion to dismiss, arguing that he had "been denied his . . . statutory right to a speedy trial in that it has been over two-hundred seventy (270) days since the(se) charges were brought . . . [and he] has been continuously held since that date."

¶75.    The record demonstrated no continuances nor requests for them from either the State or Mr. Guice, and as the Court of Appeals found, the State never provided any reason at all to the trial court or our appellate courts for the delay. ***Id***. at *4-5. Accordingly, because no continuance was granted based upon good cause, it is clear based upon the clear and unambiguous language of the statute that any trial beyond the 270 days is improper, and the

conviction should be reversed.

¶76.    However, under any application of our prior precedent regarding the statutory right to a speedy trial, or any application of *Barker*, Mr. Guice has suffered a deprivation. Indeed, the majority almost wholly fails to even examine his rights under the federal constitutional analysis set out in *Barker*, instead looking to the case of *Walton* for support. Despite that case's extension of a misguided doctrine, there was a finding of a congested docket, which was construed, however thinly, to constitute "good cause." There was absolutely no finding of any reason for any delay in the case at hand. In an extraordinary display of audacity, the State asks that we construe *absolute inaction* as a good cause for the delay of trial. Astoundingly, the majority accepts this illogical and destructive theory.

¶77.    The majority also seems to create a burden on the defendant to demonstrate that he has the intent to proceed to trial, a curious analysis that has no basis in either the plainly-written statute or our previous case law. The mental state of a defendant, and whether he actually desires a trial or a dismissal is wholly irrelevant to any analysis under the statutory or federal right to a speedy trial.

¶78.    Today I respectfully dissent for six reasons. First, because the majority today continues down a path that ignores the clear language of a valid and binding state statute. Second, because we continue to confuse state and federal law regarding speedy trials. Third, because we disregard binding U.S. Supreme Court precedent regarding the ability of a defendant to waive his right to a speedy trial. Fourth, because the majority places an additional burden on a defendant to prove intent in requesting a speedy trial. Fifth, because

41

we fail to honor our constitutional responsibility to the citizens of Mississippi to ensure the integrity of the court system of Mississippi. Sixth, and last, because Phelan Terrell Guice was denied the statutory right to a speedy trial guaranteed to all Mississippians. For these reasons, I would reverse the judgments of the Court of Appeals and the circuit court and render judgment discharging Mr. Guice because of the violation of his right to a speedy trial.

**GRAVES AND DICKINSON, JJ., JOIN THIS OPINION.**