ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. A jury sitting before the Lowndes County Circuit Court found Paul Allen Houser guilty of the possession of methamphetamine precursors.
 
 [1]
 
 Houser was sentenced as a habitual offender to sixty years in the custody of the Mississippi Department of Corrections (MDOC) with
 
 *816
 
 out eligibility for parole or probation. Aggrieved, Houser appeals and asserts that: (1) the trial court erred in denying his motion to dismiss for violating his constitutional right to a speedy trial; (2) his sentence of sixty years without parole is disproportionate to the crime committed and constitutes cruel and inhuman punishment; and (3) the trial court erred in denying his motion for a new trial because the verdict is against the overwhelming weight of the evidence. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. During the early morning hours of May 5, 2006, Houser spent about twenty minutes wandering around Dutch Village, a convenience store in Columbus, Mississippi, before he approached Crystal Strickland, the store’s cashier, to purchase two BC Cold and Sinus Powders, two lithium batteries, a Mountain Dew beverage, and a Tradewinds magazine. BC Cold and Sinus Powder contains pseudoephedrine, which is a methamphetamine precursor. Strickland testified that, prior to this incident, Houser had followed this same routine about two times per week.
 

 ¶ 3. While Houser was in the process of purchasing the items at the checkout counter, Police Officer Wade Beard entered the store. Both Officer Beard and Strickland testified that Houser became very nervous when the officer entered the store. Houser began telling Strickland to “hurry up,” and he even began trying to place the items in the bag himself. Officer Beard testified that, during this time, he paid close attention to Houser because Houser seemed unusually anxious about seeing a police officer enter the store.
 
 Officer
 
 Beard stated that he watched Houser carefully because he was concerned that a robbery may have been taking place. He testified that the store was “robbed a lot.” Officer Beard recounted how Houser left the store and the parking lot “unusually fast,” and that Houser kept looking back over his shoulder to see if Officer Beard was following him.
 

 ¶ 4. As Houser was leaving the store, Strickland informed Officer Beard that Houser was the person she had been telling him about. Strickland testified that she had previously told Officer Beard about Houser’s routine of purchasing BC Cold and Sinus Powders and lithium batteries a couple of times per week. She also testified that she had told Officer Beard that Houser had been trying to buy “pills” all the time. However, she had informed Houser that she could not sell other cold medicines during the night shift because they were kept locked away. Stickland also testified that Houser had purchased a propane tank, during her shift, prior to this instance.
 
 [2]
 
 Officer Beard testified that Strickland had previously given the police several successful leads that led to the arrests of other suspects.
 

 ¶ 5. Officer Beard radioed for assistance, and he then pursued Houser. Officer Beard testified that he did not stop Houser until he was assured other officers were close because he suspected Houser to be a methamphetamine addict and/or dealer. Officer Beard stated that his fifteen years of experience in law enforcement, ten of which had been spent dealing with the trafficking and use of methamphetamine, led him to suspect that methamphetamine users or manufacturers were more paranoid and violent than some other drug users. He also stated that they usually
 
 *817
 
 possess a weapon. However, when Houser was stopped, no weapon was found on him or in his vehicle.
 
 [3]
 

 ¶ 6. While following Houser at a distance and waiting for reinforcement from other officers, Officer Beard noticed Houser’s vehicle stopped in the middle of the road. When Officer Beard stopped Houser shortly thereafter, Officer Beard observed the BC Cold and Sinus Powders wedged between the dashboard and windshield on the passenger side of the vehicle, but he did not see the lithium batteries. Syringes were also found wedged between the dash and windshield on the passenger side. Suspecting that Houser had thrown the batteries from the car when he stopped in the middle of the road, Officer Beard instructed Officer Christopher Smith to return to the area where Houser had stopped in order to look for the lithium batteries.
 
 [4]
 
 Officer Smith found two packages of lithium batteries on the right side of the road. The side of the road on which the batteries were found, was the same side as the passenger side of Houser’s vehicle. Houser admitted that he threw the batteries out of the car because he knew that it would “look bad” for him. Even though the BC Cold and Sinus Powders were found wedged between the dash and the windshield on the passenger side of Houser’s vehicle, Houser maintained that he had not attempted to throw out the BC Cold and Sinus Powders. He claimed that he did not know that they contained pseudoephedrine. Despite his claimed ignorance, Houser had been convicted previously of the crime of possession of methamphetamine and methamphetamine precursors with the intent to manufacture an illegal substance. Although no methamphetamine was found in Houser’s vehicle, Officer Beard’s trained drug dog, Merck, signaled that Houser’s vehicle had contained drugs at some time prior to Houser’s arrest.
 
 [5]
 

 ¶ 7. In addition to the BC Cold and Sinus Powders found in Houser’s vehicle, the police found syringes and needles that were known to be the type used by methamphetamine addicts. Houser offered no medical reason for possessing them. The police also found a valve for a propane tank, which was a distinct bluish-green color, and a section of hose, similar to a garden hose. Officer Beard testified about the significance of the bluish-green color on the valve. He explained that when methamphetamine is being manufactured the producers, or “cooks,” use the propane tanks to burn off the chemical, anhydrous ammonia, and the process turns the propane tank valves an unusual bluish-green color. Anhydrous ammonia is also a precursor chemical. Miss.Code Ann. § 41-29 — 313(l)(b). Following the search of his vehicle, Houser was arrested and charged with possession of methamphetamine precursors.
 
 [6]
 

 
 *818
 
 ¶ 8. Undeterred by his May 5, 2006, arrest, Houser was arrested again on June 26, 2006, for the possession of methamphetamine precursors. Because of his June 26, 2006, arrest, at the time of the trial, Houser had two precursor charges pending.
 

 ¶ 9. On February 12, 2007, Houser waived an arraignment on the charge stemming from his May 5, 2006, arrest and entered a plea of not guilty. The case proceeded to trial on November 15, 2007. The first trial resulted in a mistrial. The second trial was held on December 6, 2007. Houser was found guilty of the crime of possession of methamphetamine precursors and sentenced as a habitual offender to sixty years in the custody of the MDOC without the eligibility for parole or probation. Houser had two prior felony convictions. The convictions were for the sale of marijuana and for the possession of meth-amphetamme and methamphetamine precursors. Aggrieved, Houser filed a notice of appeal on April 7, 2008, and he raises three issues, which we will address.
 

 DISCUSSION
 

 I. Whether the trial court erred in denying Houser’s motion to dismiss for violation of his right to a speedy trial.
 

 ¶ 10. Our standard of review when addressing the claims of speedy-trial violations is as follows:
 

 Review of a speedy trial claim involves a question of fact: whether the trial delay arose from good cause. We will uphold the trial court’s finding of good cause if that decision is supported by substantial, credible evidence. However, if no probative evidence supports the trial court’s findings, we must reverse the decision and dismiss the charge. The State bears the burden of proving good cause for the speedy trial delay, and thus bears the risk of non-persuasion. Good cause is a factual finding which is not
 
 *819
 
 different from any other finding of fact, and thus [,] an appellate court should not disturb the finding when it is based upon substantial evidence identified from the record.
 

 Carr v. State,
 
 966 So.2d 197, 200(¶5) (Miss.Ct.App.2007) (internal citations omitted).
 

 ¶ 11. Houser’s brief to this Court relies primarily on
 
 Barker v. Wingo,
 
 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and its four-part analysis to support his claim of a speedy-trial violation. However, when he presented his motion to dismiss for a violation of his Sixth Amendment right to a speedy trial to the trial court, he asserted a violation of his statutory right under Mississippi Code Annotated section 99-17-1 (Rev.2007) and its “270-Day Rule.” We will address both, beginning with our state’s legislative mandate.
 

 ¶ 12. Mississippi Code Annotated section 99-17-1 states: “Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.” Houser was arrested on May 5, 2006, and he waived arraignment on February 12, 2007, entering a plea of not guilty. Houser’s first trial was held on November 15, 2007, which was 275 days from his waiver of an arraignment proceeding. We find that the record supports the trial judge’s determination that this five-day difference did not violate Houser’s statutory rights because there had been “good cause shown” for the delay, and all the continuances had been duly granted. The continuances were due to the Court’s congested docket and because of confusion by both the State and Houser about witnesses and evidence needed for Houser’s two pending charges. We will briefly explain the reasons for the continuances.
 

 ¶ 13. On June 1, 2007, the circuit court granted a continuance because it was involved in a different matter that conflicted with Houser’s trial date. The circuit court reset Houser’s trial for August 30, 2007. The circuit court granted the June 1st continuance before Houser filed his first motion to dismiss for a speedy trial violation, which was filed on June 15, 2007.
 

 ¶ 14. The next continuance was granted on August 30, 2007. The reasons reflected for the continuance were: (1) a witness for the State was unavailable, and (2) Houser was attempting to obtain medical records. However, the witness and the medical records were related to Houser’s pending charge, stemming from his arrest on June 26, 2006. Although both parties were mistaken about the need for this continuance, the trial judge weighed this continuance against the State when he considered this continuance under the
 
 Barker
 
 factors.
 

 ¶ 15. The final continuance was granted on September 7, 2007, and it was brought by the court, not the prosecution. This continuance was necessary because the circuit court was involved in another case where a defendant had made a motion for a speedy trial. During the motion hearing in the instant case, the trial judge lamented about the problem of congested court dockets, and he discussed how the circuit court started each term with approximately 495 cases before any new cases were added. Indeed, the problem of congested court dockets has been previously recognized by the supreme court.
 
 See Guice v. State,
 
 952 So.2d 129, 140(¶23) (Miss.2007) (A congested trial docket supported the trial court’s “good cause” finding for the delay in bringing the defendant to trial). Given that Houser was brought to trial within 275 days of his waiver of an arraignment, only five days beyond the time
 
 *820
 
 established by the statute, and there was good cause shown for some of the continuances that were duly granted, we find that the trial judge was correct in his determination that Houser’s statutory right under Mississippi Code Annotated section 99-17-1 had not been infringed. We now address Houser’s constitutional concerns.
 

 ¶ 16. “The Sixth Amendment to the United States Constitution establishes a right to a ‘speedy and public trial.’ ”
 
 Carr,
 
 966 So.2d at 200(¶ 6) (citing U.S. Const, amend. VI). The Supreme Court has observed that this right is as fundamental as any right secured by the Sixth Amendment, and its roots are at the very foundation of our English-law heritage.
 
 Id.
 
 (citation omitted). “The federal constitutional right is applied to the states through the Fourteenth Amendment.”
 
 Id.
 
 (citation omitted). Accordingly, “Article 3, section 26 of the Mississippi Constitution of 1890 guarantees a criminal defendant a ‘speedy and public trial.’ ”
 
 Id.
 
 This federal and state constitutional right “attaches when a person has been accused, either by way of arrest, indictment or information.”
 
 Id.
 
 at 200(¶ 6) (citation omitted). In an attempt to establish what the parameters of a “speedy trial” were and when an accused’s right to a speedy trial had been violated, the Supreme Court announced a four-part balancing test in
 
 Barker.
 

 ¶ 17. “The four factors are (1) length of the delay, (2) the reason for the delay, (3) the defendant’s assertion of his right to a speedy trial, and (4) prejudice to the defendant.”
 
 Id.
 
 at 201(¶ 7) (citation omitted). “The Mississippi Supreme Court has adopted the
 
 Barker
 
 analysis as applicable to the state constitutional speedy trial right; accordingly, we will consider the constitutional claims together.”
 
 Id.
 
 (citation omitted).
 

 ¶ 18. The Supreme Court stated that the “balancing test necessarily compelled] courts to approach speedy trial cases on an
 
 ad hoc
 
 basis.”
 
 Barker,
 
 407 U.S. at 530, 92 S.Ct. 2182. And, the Mississippi Supreme Court has encouraged our “trial judges, when confronted with constitutional and/or statutory speedy trial issues, to make a detailed record on the procedural history of the case under discussion, such as date of arrest, date of arraignment, eventual trial date, reasons for delay, and the like.”
 
 Guice,
 
 952 So.2d at 142(¶ 30). To the benefit of this Court, the record reveals that the trial judge diligently considered all of the elements of the four-part balancing test and weighed the factors either in the State’s or Houser’s favor. We will briefly discuss each factor.
 

 1. Length of Delay
 

 ¶ 19. “[The] first factor has been called a triggering mechanism because until there is some delay which is presumptively prejudicial, there is no need for an inquiry into the other balancing test factors.”
 
 Carr,
 
 966 So.2d at 201(¶ 8) (citing
 
 Barker,
 
 407 U.S. at 531-32, 92 S.Ct. 2182). “[TJhere must first be a finding of a ‘presumptively prejudicial’ delay or our inquiry on the issue ends.”
 
 Id.
 
 “An eight-month delay between arrest and trial has been found to be presumptively prejudicial.”
 
 Id.
 
 (citing
 
 Smith v. State,
 
 550 So.2d 406, 408 (Miss.1989)). Houser correctly argues, and the trial judge recognized, there is a presumption of prejudice under the first factor because more than eight months passed between Houser’s arrest and his trial.
 

 2. The Reason for the Delay
 

 ¶ 20. The second factor considers whether the delay was justified, and the burden shifts to the prosecution to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of the reasons.
 
 Id.
 
 at (¶ 9). At the outset of
 
 *821
 
 the trial judge’s analysis, he declined to weigh the first ninety days after Houser’s indictment against the State or the defense. Even though the trial judge recognized that there are districts where defendants are indicted the first week of the term of court and then tried the next, he opined that, if he did that, he did not “think that [he] would have any public defenders that would stay,” and it was often not possible due to the congested court dockets. He also determined that the first ninety days should be neutral because the delay inured to the defendant’s benefit. This possible benefit has been recognized by both the United States Supreme Court and the Mississippi Supreme Court. The supreme court has stated:
 

 A ... difference between the right to [a] speedy trial and the accused’s other constitutional rights is that deprivation of the right may work to the accused’s advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused’s ability to defend himself.
 

 Guice,
 
 952 So.2d at 139(¶ 22) (quoting
 
 Barker,
 
 407 U.S. at 521, 92 S.Ct. 2182). Based upon this truth and the unique facts of this case, we find no error in the trial judge’s refusal to weigh the first ninety days against the State or Houser. Perhaps, if Houser had chosen to utilize the first ninety days, he may have been able to prove his assertion at trial that the lithium batteries were simply for his game camera, which he claimed to have set up in some woods. However, Houser never produced the game camera, claiming that his son could not find it, nor could Houser recall exactly where he bought the camera or what brand it was.
 
 [7]
 

 ¶ 21. Houser recognizes in his brief to this Court that “[o]ffieial negligence and court congestion, the likely causes of the delay in this instance, are ‘more neutral’ reasons that weigh ‘less heavily [against the State].’ ” However, he argues the reasons should be weighed in his favor. His argument is not completely accurate. We have previously held, “[d]elays due to crowded dockets
 
 are not
 
 weighed heavily against the State. In fact, crowded dockets, judicial engagements, and a shortage of prosecutorial staff are neutral reasons for delay....”
 
 Horton v. State,
 
 726 So.2d 238, 246(1134) (Miss.Ct.App.1998) (internal citation omitted) (emphasis added). In a later case, we held that congested court dockets will be “weighed
 
 only slightly
 
 against the State. However, a deliberate attempt to sabotage the defense by delaying the trial will be weighed very heavily against the State.”
 
 Muise v. State,
 
 997 So.2d 248, 252(¶ 13) (Miss.Ct.App.2008) (internal citations omitted) (emphasis added). As stated, the reasons for two of the continuances stemmed from court congestion, and one continuance was because of mistake and confusion on the part of the State and Houser concerning witnesses and evidence related to Houser’s two pending charges. There is nothing in the record that indicates that the State exercised a “deliberate attempt to sabotage the de
 
 *822
 
 fense by delaying the trial.” Therefore, we agree with the trial judge and find that two of the delays are neutral, and we decline to weigh them against the State. We weigh one continuance only slightly against the State, given that Houser also mistakenly sought the continuance to acquire evidence.
 

 S. Houser’s Assertion of His Right to a Speedy Trial
 

 ¶ 22. This Court has stated:
 

 Though the State has the burden to provide a speedy trial, a defendant attains more points under this factor of the
 
 Barker
 
 test if he has asserted his right to a speedy trial. Failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial. [The defendant] effectively asserted his speedy trial right by making two separate demands for a speedy trial.
 

 Muise,
 
 997 So.2d at 253(¶ 15) (internal citations and quotations omitted). Houser, like John Peter Muise, did invoke his right to a speedy trial three times: He asserted it once in a pro se motion and twice through his attorney. This was considered by the trial judge in his analysis. The trial judge noted that Houser filed his first motion for a speedy trial or, in the alternative, to dismiss for a speedy-trial violation on June 15, 2007. Houser went to trial about four months later. We find that Houser’s assertion of his right weighs in his favor.
 

 U. Prejudice to Houser
 

 ¶ 23. Houser asserts that his defense was “exceedingly disadvantaged by the [559-day] delay in bringing him to trial.” We disagree.
 

 In considering whether [a defendant] was prejudiced by the delay, we must look to the three interests for which the speedy trial right was designed: (I) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Generally, proof of prejudice entails the loss of evidence, the death of witnesses, or the staleness of an investigation. The possibility of impairment of the defense is the most serious consideration in determining whether the defendant has suffered prejudice as a result of delay. Mississippi case law does not recognize as prejudice the negative emotional, social, and economic impacts that accompany incarceration. Consequently, a defendant’s assertion of prejudice attributable solely to incarceration, with no other harm, typically is not sufficient to warrant reversal.
 

 Jenkins v. State,
 
 947 So.2d 270, 277(¶21) (Miss.2006) (internal citations and quotations omitted). In his brief to this Court, Houser makes the blanket statement that he “was unable to pursue his defense ... and provide outside assistance to counsel because of his incarceration,” but he has not shown how he would have assisted his counsel had he not been incarcerated or how he was unable to pursue his defense. Furthermore, Houser was out on bond from May 5, 2006, the time of his arrest in the instant case, until February 2007, when his bond was revoked because of his June 26, 2006, arrest for the possession of methamphetamine precursors. The trial judge noted that the only argument that Houser had presented in support of his claimed prejudice was that “folks might not remember things.” The record does not indicate, nor has Houser shown, that any witnesses or police officers involved in the instant case failed to remember the events at trial. Houser’s claim of prejudice is unsupported.
 

 
 *823
 
 ¶ 24. We find that the trial court was well 'within its discretion in determining that the 559 days between Houser’s arrest and trial did not violate either his statutory or his constitutional right to a speedy trial. The trial judge carefully considered Houser’s claims and applied the appropriate judicial tests. Finding no error by the trial court, we find that this issue is without merit.
 

 II. Whether Houser’s sentence of sixty years without eligibility for parole is disproportionate to the crime committed and constitutes cruel and inhuman punishment.
 

 ¶ 25. “We note at the outset that the Mississippi Supreme Court has held that ‘the imposition of a sentence is within the discretion of the trial court, and this Court will not review the sentence, if it is within the limits prescribed by statute.’ ”
 
 Bridges v. State,
 
 973 So.2d 246, 249(¶ 12) (Miss.Ct.App.2007) (citing
 
 Reynolds v. State,
 
 585 So.2d 753, 756 (Miss.1991)). Mississippi Code Annotated section 41-29-313(l)(c) (Rev.2005) establishes that the maximum sentence for possession of two or more precursor chemicals with the intent to manufacture methamphetamine is thirty years. As a subsequent drug offender, Houser’s sentence could be doubled for a maximum of sixty years. Miss. Code Ann. § 41-29-147 (Rev.2005).
 
 See Bridges,
 
 973 So.2d at 250 n. 4.
 

 ¶ 26. Houser argues that his sentence violated the United States and Mississippi Constitutions’ prohibitions of cruel and unusual punishment. He claims his sentence should be evaluated under the proportionality analysis set forth by the United States Supreme Court in
 
 Solem v. Helm,
 
 463 U.S. 277, 291, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), which consists of three factors: (1) the gravity of the offense and the harshness of the penalty; (2) a comparison with the sentences imposed on other criminals in the same jurisdiction; and (3) a comparison with the sentences imposed for commission of the same crime in other jurisdictions. We disagree.
 

 ¶ 27. The case,
 
 Tate v. State,
 
 912 So.2d 919 (Miss.2005) is analogous to the case at bar, and Houser’s argument virtually mirrors the one made by Kirby Tate. In
 
 Tate,
 
 the defendant was convicted of delivery of more than an ounce but less than a kilogram (435.3 grams) of marijuana and possession of more than an ounce but less than a kilogram (531.0 grams) of marijuana with intent to distribute.
 
 Id.
 
 at 922(¶ 3). He was sentenced, as a habitual offender, to serve sixty years without the possibility of parole or the sentence being reduced or suspended.
 
 Id.
 
 at 922-23(¶ 3). Tate argued that, since his sixty-year sentence without parole would leave him incarcerated until he was ninety-nine years old, it amounted to a life sentence.
 
 Id.
 
 at 932-33(¶ 47). The supreme court declined to find Tate’s argument persuasive and stated that, because his sentence was within the statutory limits, “the trial court sentenced Tate correctly.”
 
 Id.
 
 at 933(¶ 51).
 

 ¶ 28. Houser is correct in arguing that a sentence may be subject to attack if it is grossly disproportionate to the crime committed. “[Wlhere a sentence is ‘grossly disproportionate’ to the crime committed, the sentence is subject to attack on the grounds that it violates the Eighth Amendment prohibition of cruel and unusual punishment.”
 
 Id.
 
 at 933(¶ 49) (citing
 
 Hoops v. State,
 
 681 So.2d 521, 537 (Miss.1996)). Yet, the supreme court has held that “apart from a sentence of life in prison without the possibility of parole or a sentence which is manifestly disproportionate to the crime committed, an extended proportionality analysis is not required by the Eighth Amendment when there is an allegation of cruel and unusual punish
 
 *824
 
 ment.”
 
 Id.
 
 (citing
 
 Barnwell v. State,
 
 567 So.2d 215, 221 (Miss.1990)). Houser argues that his sentence is grossly disproportionate claiming that he has been given this sentence simply for purchasing BC Powders and batteries. He further argues that just because the items he possessed can be used for the purpose of manufacturing methamphetamine, that fact “does not mean that [he] was going to use them for that purpose.” This argument is unpersuasive. The jury found that Houser had violated Mississippi Code Annotated section 41-9-313. Therefore, he was found guilty, not only for the purchase and possession of the items, but also for having the intent to unlawfully manufacture methamphetamine. In other words, the State proved, and the jury found, that he intended to use the items for an illegal purpose.
 

 ¶ 29. Houser also complains that the judge sentenced him as a repeat offender under Mississippi Code Annotated section 99-19-81 (Rev.2007) without commenting on the “apparent harshness of this sentence.” The trial judge’s lack of comment about the harshness of Houser’s sentence is of no significance. It is clear from the record that the trial judge was diligent in his duties and clearly followed the law.
 

 ¶ 30. During the sentencing phase of Houser’s trial, the trial judge first verified that Houser had prior felony convictions, and he confirmed that the “Mr. Houser” in the courtroom was the same “Mr. Houser” referenced in the “pen packs” and court files. The trial judge confirmed that Houser was convicted in Lowndes County on October 23, 1983, of the crime of sale of marijuana, less than one ounce, and had been sentenced to three years. The judge then stated that Houser was convicted again for the crime of possessing methamphetamine and for being in possession of two or more methamphetamine precursors with intent to manufacture. The judge recited that Houser had been sentenced to a term of four years for each of those crimes, and the sentences were ordered to run concurrently. The trial judge detailed sufficient facts to show that Houser was a habitual offender, and he verified that both of Houser’s prior convictions made him eligible for enhanced sentencing under Mississippi Code Annotated Section 41-29-147.
 

 ¶ 31. The trial judge acknowledged Houser’s argument that a sentence as a habitual offender would, in essence, equate to a life sentence. However, the judge stated the following:
 

 The court does not find that this sentence constitutes a cruel and unusual punishment. This is Mr. Houser’s fourth felony conviction, all four of which are violations of the Mississippi [c]on-trolled [s]ubstances [l]aws of this state. Moreover, while Mr. Houser is certainly presumed innocent of [the] pending charge, ... [he] has another charge of possession of methamphetamine precursors with intent to manufacture....
 

 Now, accordingly, the [c]ourt believes that it has but one sentence, that the law is quite clear on this, that once there’s a determination that the gentleman is [a] habitual offender, and he is [a] habitual offender under the controlled substances laws of this state, then the [c]ourt has but one sentence.
 

 The trial judge appropriately applied the sentencing mandates under Mississippi Code Annotated sections 41-29-147
 
 [8]
 
 and
 
 *825
 
 99-19-81
 
 [9]
 
 . It is of no significance that he did not specifically state whether he found the sentence to be harsh.
 

 ¶ 32. Just as in
 
 Tate,
 
 the sentence may be harsh, but it is not “grossly disproportionate” to Houser’s crime.
 
 See Tate,
 
 912 So.2d at 984(¶ 53). The supreme court has held that it is within the Legislature’s prerogative to determine that three drug offenses can result in a sentence of sixty years without the possibility of parole or of early release.
 
 Id.
 
 “The Legislature has made its decision, and we may not -impose our own opinion on the issue, absent a constitutional violation which we do not find.”
 
 Id.
 
 Accordingly, this issue is without merit.
 

 III. Whether the trial court erred in denying his motion for a new trial because the verdict is against the overwhelming weight of the evidence.
 

 ¶ 33. Houser claims that the jury verdict is against the overwhelming weight of the evidence, and that the instant case should be reversed and remanded for a new trial. We disagree. The supreme court has stated:
 

 The standard of review for denial of a motion for new trial is well-established. This Court[ ] sits as a “thirteenth juror” and, in determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal. As such, if the verdict is against the overwhelming weight of the evidence, then a new trial is proper.
 

 Jenkins,
 
 947 So.2d at 278(¶24) (internal quotation omitted).
 

 ¶ 34. Houser argues that the mere presence of the BC Cold and Sinus Powders, the lithium batteries, the valve with the distinct bluish-green color, the hose, and the needles and syringes is insufficient to prove that he had the intent to manufacture methamphetamine. He argues that his intended use of the products was legal. He also takes issue with the fact that the police did not take fingerprints from the valve or hose, nor did they photograph them or produce them at trial. He further argues that the police failed to “check[ ] or test[ ] [them] for ... use [in] making methamphetamine.” We find that the State clearly presented the facts related to Houser’s actions during the early morning of May 5, 2006, and the State clearly presented the facts related to the process of manufacturing methamphetamine and the habits of those involved in the process.
 
 *826
 
 The record confirms that a reasonable juror could find that Houser intended to use the precursors for the production of methamphetamine.
 

 ¶ 35. Sitting as the “thirteenth juror,” we will briefly recite some of the testimony and evidence presented to the jury at Houser’s trial. First, the State made it abundantly clear that the mere possession of these household items was insufficient to find someone in violation of the precursor statute. More than one police officer testified that a suspect or defendant must exhibit the intent to use them in the production of an illegal substance. Next we address the police officers’ decision not to attempt to get fingerprints from the valve or hose found in Houser’s truck or to produce them at trial.
 

 ¶ 36. The State provided testimony explaining that fingerprints would likely not have been retrievable on the items because they had been exposed to the elements, and there was misting rain and humid weather the morning the items were found in the back of Houser’s truck. Officer Joey Brackin testified that weather of that type would have likely destroyed any retrievable fingerprints. The decision not to fingerprint the items does not negate the fact that the items were found in Houser’s possession.
 

 ¶ 37. Officer Brackin testified about the process of manufacturing methamphetamine. At the time of trial, Officer Brac-kin was the commander of the Lowndes County narcotics unit, as well as a twenty-five-year veteran in law enforcement. He detailed how the manufacturers of methamphetamine acquire anhydrous' ammonia,
 
 [10]
 
 how they utilize it in the process, and how the anhydrous ammonia turns the propane tank valves a distinct bluish-green color. He also discussed how methamphetamine users typically either smoked the drug, or they injected the drug with the same type needles and syringes that were found in Houser’s vehicle.
 

 ¶ 38. Officer Brackin testified that the police had not kept the valve and hose because once the anhydrous ammonia has evaporated, there is no way that it can be proven that the valve had anhydrous ammonia in it. However, he, along with numerous other trained officers, had observed the valve with its distinct discoloration. Officer Brackin testified that because of those reasons, along with the fact that there was limited storage space for evidence obtained from drug labs and investigations, he did not keep the valve and the piece of hose to produce at trial. Officer Brackin, and forensic scientist Alicia Waldrop, an employee of the Mississippi Crime Laboratory, testified that the manufacturing of methamphetamine required only a minimal amount of pseu-doephedrine, and the amount in the BC Cold and Sinus Powders purchased by Houser would be sufficient to produce methamphetamine.
 

 ¶ 39. There was extensive testimony about how the habits of methamphetamine manufacturers had been altered because of changes in the law. The current law requires stores to keep medicines that contain precursors, such as pseudoephedrine, behind the counter, and purchasers are required to sign a log when they purchase these products.
 
 [11]
 
 Testimony by the police
 
 *827
 
 discussed how, due to the change in the law, the methamphetamine manufacturers no longer could acquire large amounts, so they would repeatedly purchase small amounts at various stores, in order to avoid drawing attention to themselves. There was further testimony presented about how the police had not realized that BC Cold and Sinus Powders contained pseudoephedrine until they began seeing an increase in the purchase of these powders by those known to be involved in the drug community.
 

 ¶ 40. The verdict was not “so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Jenkins,
 
 947 So.2d at 278(¶ 24). In addition to the extensive testimony concerning the manufacturing of methamphetamine, there was uncontradicted testimony given that Houser purchased and possessed the precursor items and had been purchasing such items at least two times per week for a considerable time before his arrest in the instant case. The State also produced the receipt memorializing Houser’s purchase of these items on May 5, 2006.
 

 ¶ 41. In an attempt to provide a legal reason for his routine purchase of lithium batteries, Houser testified that he used the batteries lor his game camera. However, he also testified that he did not remember what brand it was or exactly where he had purchased it. Yet, he claimed that the batteries needed to be replaced about once per month. Houser failed to produce the camera as evidence, claiming that his twenty-year-old son could not locate it. Although he testified that he would know exactly where it was located, he failed to retrieve the alleged camera while he was not incarcerated. Testimony revealed to the jury that Houser had not been incarcerated the entire time between his May 5, 2006, arrest and his trial.
 

 ¶ 42. As stated, the items such as the valve, hose, and syringes were found in the vehicle that Houser
 
 routinely
 
 drove. Another pertinent fact before the jury was Strickland’s testimony that Houser
 
 routinely
 
 was going to Dutch Village to purchase these items during the wee hours of the morning, rather than during the day. The jury found that Houser’s actions that early morning were not random; rather, he was simply repeating what he had done many times before.
 

 ¶ 43. The time of the incident was about 3:00 a.m., and Strickland testified that this was the normal time that Houser came to the store. There was no testimony that Houser worked an evening shift or that he had any other work requirements that would have prevented him from shopping for these items during the day. We emphasize that one should not construe our opinion in the instant case to state that shopping in the middle of the night
 
 automatically
 
 should raise one’s suspicion of the possibility of illegal activity, but Houser’s routine was a fact that a reasonable juror could consider. Furthermore, Strickland testified that Houser had been trying to persuade her to sell him more “pills” in those early morning hours, but she could not sell them to him because she did not have access to them.
 

 ¶ 44. Finally, although a proper jury instruction concerning Houser’s prior felony convictions was given, the jury was aware that Houser had been convicted of previously for the possession of methamphetamine and methamphetamine precursors.
 
 [12]
 
 Considering this, it certainly would
 
 *828
 
 not have been unreasonable for the jury to disbelieve Houser’s assertion that he was unaware that the products he was purchasing, at least two times per week, were methamphetamine precursors. The cumulative effect of the testimony and exhibits presented at trial could certainly lead a fair-minded juror to determine that Houser indeed purchased and possessed the precursors with the intent to use them for an illegal purpose. Therefore, we find that the weight of the evidence was sufficient to support the jury’s verdict. Accordingly, we find this issue is without merit.
 

 ¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY OF CONVICTION OF UNLAWFUL POSSESSION OF PRECURSOR CHEMICALS AND SENTENCE AS A HABITUAL OFFENDER TO SIXTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LOWNDES COUNTY.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR. KING, C.J., CONCURS IN RESULT ONLY.
 

 [1]
 

 . Mississippi Code Annotated section 41-29-313 (Rev.2005) makes possession of precursor drugs or chemicals unlawful if the person in possession of the precursors intends to use them to manufacture methamphetamine.
 
 Green v. State,
 
 880 So.2d 377, 380(11 11) (Miss.Ct.App.2004). Section 41-29-313 lists the types of drugs or chemicals which are considered precursor drugs.
 
 Id.
 
 Mississippi Code Annotated section 41 —29—313(1 )(a) — (I) (Rev. 2005) states:
 

 Except as authorized in this section and in Section 41-29-315, it is unlawful for any person to knowingly or intentionally: (i) Purchase, possess, transfer, manufacture, attempt to manufacture or distribute any two (2) or more of the listed precursor chemicals or drugs in any amount with the intent to unlawfully manufacture a controlled substance.
 

 Subsection (b) of Section 41-29-313 includes a list of precursors, and tire list includes pseu-doephedrine, lithium, and anhydrous ammonia, which are the precursors connected to the case at bar. "The term 'precursor drug or chemical' means a drug or chemical that, in addition to legitimate uses, may be used in manufacturing a controlled substance...." Miss.Code Ann. § 41 — 29—313(1 )(b) (Rev. 2005).
 

 [2]
 

 . Testimony established that propane tank valves are used in the manufacture of methamphetamine.
 

 [3]
 

 .Apparently, the truck that Houser was driving that evening was not titled in his name. Houser would have this Court infer that some of the items found in the vehicle were not his because of this, but testimony established that Houser had been in possession of the vehicle for quite some time prior to his arrest on May 5, 2006. And, there was undisputed testimony by Strickland that she had seen Houser driving that vehicle, as well as a van, on numerous occasions.
 

 [4]
 

 . The area where Houser stopped and the batteries were found was about one and a half miles from the store where Houser had purchased the items.
 

 [5]
 

 . Officer Beard gave extensive testimony about his training in narcotics investigations and about how the trained drug dog indicated whether there were, or had been, drugs in a vehicle.
 

 [6]
 

 . When first stopped by Officer Beard, Houser refused to allow Officer Beard to search his
 
 *818
 
 vehicle. However, after Officer Beard had placed Houser in the patrol car to secure him for the safety of the officers, it was discovered that Houser was driving with a suspended license, so he was arrested for that offense. After his arrest, the vehicle was secured and subsequently searched. The search of the vehicle produced the items stated above. We are cognizant of the United States Supreme Court holding in
 
 Arizona v. Gant,
 
 - U.S. -, -, 129 S.Ct. 1710, 1723, 173 L.Ed.2d 485 (2009) wherein the Supreme Court held that:
 

 Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee’s vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.
 

 Although Houser does not raise any issue related to the validity of the search, we will briefly address why the search of his vehicle was proper. While Houser was secured in Officer Beard's patrol car, the trained drug dog indicated that the vehicle had a residual odor of drugs. The drug dog’s indication of drugs alone constituted probable cause for the search.
 
 Pegues v. State,
 
 840 So.2d 721, 725(1110) (Miss.Ct.App.2002). Furthermore, the BC Cold and Sinus powders were visible through the windshield of the vehicle, and they would have been discovered in an inventory search; these facts also justified the war-rantless search.
 
 See Edwards v. Stale,
 
 795 So.2d 554, 563 (¶¶ 37, 38) (Miss.Ct.App.2001). “A warrantless search of an automobile is permissible where ... officers have probable cause to believe the vehicle contains contraband.”
 
 United States v. Bustamante-Saenz,
 
 894 F.2d 114, 117 (5th Cir.1990) (citation omitted). As stated, Officer Beard pursued and stopped Houser specifically for the possession of methamphetamine precursors. Considering all of the facts surrounding his arrest, the officers had probable cause to believe the vehicle Houser was driving contained contraband.
 

 [7]
 

 . Houser claims that he could not locate it because he was incarcerated, but the record reveals that Houser was out on bond for nine months before his bond was revoked because of his June 26, 2006, arrest.
 

 [8]
 

 . Mississippi Code Annotated section 49-29-147 (Rev.2005) states, in part:
 

 [A]ny person convicted of a second or subsequent offense under this article may be imprisoned for a term up to twice the term otherwise authorized, fined an amount up to twice that otherwise authorized, or both.
 

 
 *825
 
 For purposes of this section, an offense is considered a second or subsequent offense, if, prior to his conviction of the offense, the offender has at any time been convicted under this article or under any statute of the United States or of any state relating to narcotic drugs, marihuana, depressant, stimulant or hallucinogenic drug.
 

 [9]
 

 . Mississippi Code Annotated section 99 — 19— 81 states:
 

 Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere,
 
 shall
 
 be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence
 
 shall not be reduced or suspended nor shall such person be eligible for parole or probation.
 

 (Emphasis added).
 

 [10]
 

 . The State presented extensive testimony that explained the process ol manufacturing methamphetamine and the significance of the various chemicals. We decline to give a more detailed account, and will address the details we find to be most significant.
 

 [11]
 

 . Mississippi Code Annotated section 41-29-315 (Rev.2005) establishes restrictions on ibe purchase and sale of certain methamphetamine precursors, as well as the penalties that may be assessed for violations of this section.
 

 [12]
 

 . Mississippi Rules of Evidence 404(b) provides:
 

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in
 

 
 *828
 
 conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.