# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00249-COA

**BRANDON DEJOHNETTE A/K/A BRANDON LATERRANCE DEJOHNETTE**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:           02/17/2022
TRIAL JUDGE:                HON. LILLIE BLACKMON SANDERS
COURT FROM WHICH APPEALED:  WILKINSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY: JUSTIN T. COOK
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: LAUREN G. CANTRELL
DISTRICT ATTORNEY:          SHAMECA COLLINS
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 10/03/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Brandon DeJohnette was arrested for shooting and killing his then-girlfriend Mirrander McClain on November 19, 2018. After being tried on February 15, 2022, Brandon was found guilty of first-degree murder and sentenced to serve life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Brandon claims that his constitutional speedy-trial right was violated and that the circuit court erred by refusing his proposed heat-of-passion jury instruction. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Brandon DeJohnette, also known as "B," was the estranged boyfriend of Mirrander

McClain. They had been living together since 2016. On November 19, 2018, Mirrander was working at Centreville Headstart Center while Brandon was visiting Mirrander's mother, Clara McClain, at her house. They were drinking, hanging out, and "having an alright time together." During this time, Clara told Brandon that a "guy was liking [Mirrander]."

¶3. Mirrander called Clara while Brandon was still at her house. When Clara answered, Brandon took the phone from Clara and began "ha[ving] harsh words with Mirrander." After the conversation ended, Brandon left Clara's house to head over to Mirrander's house.

¶4. On Mirrander's way home from work, Mirrander stopped by her sister Latosha's house, which was no more than a hundred feet away from Mirrander's house. When Latosha was later questioned by the police, she recalled her last moments with Mirrander.

¶5. Latosha stated that on the day of Mirrander's murder, Mirrander was her happy, normal self until she received a message from Brandon accusing her of "going with somebody else." Latosha recalled that when Mirrander was at her house, she and Brandon had been "arguing back and forth through the[ir] text messages," and both seemed upset about the accusation.

¶6. Mirrander left Latosha's house and went home. Brandon met Mirrander on her porch, and the two continued with their earlier confrontation. Brandon later alleged in his police statement that Mirrander had been trying to get her brother to do something to him. Brandon further asserted that when he was trying to leave, she told him to stay. Brandon also said that Mirrander hit him on the head. In the end, he shot her five times, emptying his magazine clip.

¶7. Latosha's daughter, Zuccaria, heard the gunshots while washing her hair in the kitchen sink. When she looked out the window, she saw a blur of Brandon's black Avalanche speeding out of Mirrander's driveway. Latosha sent Zuccaria outside to determine the location of the gunfire. As Zuccaria walked up to Mirrander's house, she saw that Mirrander had been shot and ran to tell Latosha. When Latosha came to the porch, she saw that Mirrander was alive but lying at the front door of her porch in a pool of blood. Latosha asked Mirrander, "Did Brandon do this to you?" Mirrander responded, "Yes, he did."

¶8. The authorities were called to the scene. When Deputy Lemuel Rutledge, an investigator from the Wilkinson County Sheriff's Office, arrived at the scene with Deputy Lashonda Grayson, he heard some of Mirrander's family members screaming that they needed help to stop Mirrander's bleeding. The deputies hurriedly performed CPR and attempted to stop Mirrander's bleeding. Shortly after, the deputies used their patrol vehicle to transport Mirrander to the hospital.

¶9. In the midst of Deputy Rutledge's investigation, someone reported that a person's vehicle had run into the neighbor's fence near Mirrander's house. Deputy Rutledge found a black pouch containing bankcards and a Mississippi identification card belonging to Brandon in that area. The bumper of Brandon's Avalanche was later found in that area, as well. Afterward, the Wilkinson County Sheriff's Office issued a warrant for Brandon's arrest.

¶10. Brandon had fled to his sister's house in Baton Rouge, Louisiana, parked the Avalanche in the backyard, and hid. But his sister, Shanekia DeJohnette, called the police.

3

On the night of November 19, 2018, the police arrived at Shanekia's house to apprehend Brandon. When Brandon failed to comply, a K-9 unit dog was sent in the house to retrieve him. Brandon was then arrested after midnight, on November 20, 2018.

¶11. Brandon was given his *Miranda*[1] rights. But he waived his rights and agreed to give a statement. Brandon told a police officer that he knew they had a witness placing him at the scene. When the police officer did not respond, Brandon's demeanor seemingly changed. At this time, Brandon mentioned that he had never carried a gun but just happened to possess a firearm that day. The police officer asked Brandon, "[W]hat led [you] to shoot Mirrander?" Brandon responded that Mirrander had a way of pushing his buttons and had done so for two years. Later, Brandon also said that Mirrander had previously pulled a gun on him.

¶12. On November 21, 2018, the police charged Brandon with murder and resisting arrest. On January 24, 2020, after being detained for over fourteen months, Brandon filed a "Motion to Dismiss for Lack of a Speedy Trial, or in the Alternative, Bond Reduction, and Other Relief" ("motion to dismiss").

¶13. On February 10, 2020, the circuit court held a hearing on Brandon's speedy-trial claim in his motion to dismiss. At the hearing, the circuit judge found that (1) fifteen months was not a long time, (2) the delay was due to the district attorney's office's change in administration, which was not entirely the State's fault, and (3) the delay did not cause Brandon any prejudice. On February 21, 2020, the circuit court entered an order denying Brandon's motion to dismiss. On February 19, 2020, the grand jury issued an indictment

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

against Brandon for the first-degree murder of Mirrander McClain pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2017).

¶14. Brandon was arraigned on June 1, 2020. He pled not guilty. On August 14, 2020, the circuit court set his trial for October 6, 2020. Sometime later, Brandon moved to continue the trial. On September 28, 2020, the circuit court entered an agreed order to continue the trial date, and on January 19, 2021, set trial for February 23, 2021. Brandon moved to continue the trial once more. On February 1, 2021, the circuit court entered another agreed order to continue the trial date, and later rescheduled the trial for June 15, 2021. On May 27, 2021, Brandon moved to continue the trial a third time. In this motion, Brandon's counsel requested the trial be continued because he had a personal conflict. Brandon's counsel asked the circuit court to reschedule the trial to June 29, 2021. On June 2, 2021, the circuit court granted the motion and continued the trial date to June 28, 2021.

¶15. On June 28, 2021, the circuit court considered whether Brandon was mentally competent to proceed with trial. The circuit court judge conducted an in-chamber examination of Brandon after it was brought to the circuit court's attention that Brandon had previously been prescribed medication for depression and anxiety. Moreover, for the very first time Brandon claimed to have seen a spirit when he fired the gun at Mirrander. Accordingly, the circuit court continued the trial date because of Brandon's representations of mental incompetence.

¶16. On July 8, 2021, Brandon filed a written motion for a mental evaluation. On August 4, 2021, the circuit court found that Brandon was entitled to a mental evaluation and ordered

5

him to be examined by Dr. Criss Lott. On September 20, 2021, the circuit court continued the trial date to October 21, 2021. On September 29, 2021, Brandon's counsel moved to continue the trial because he was representing another defendant in a trial beginning on October 18, 2021. On October 4, 2021, the circuit court granted the continuance and reset the trial date to February 15, 2022. On October 28, 2021, Dr. Lott submitted the results of his evaluation of Brandon. Dr. Lott's conclusions were that Brandon "appeared alert, attentive and he responded promptly to questions. His responses were of normal rate and low in tone." Dr. Lott also found to a reasonable degree of certainty that Brandon had the ability to understand the nature of the legal proceedings against him. On February 7, 2022, after a hearing and considering Dr. Lott's findings, the court found Brandon was competent to stand trial.

¶17. The trial commenced on February 15, 2022. At the end of the trial, the court held a jury instruction conference. During the conference, the circuit court refused Brandon's heat-of-passion jury instruction because no evidence supported the instruction. On February 17, 2022, the jury found Brandon guilty of first-degree murder, and the court sentenced him to serve life imprisonment in the custody of the MDOC. Brandon appeals.

**STANDARD OF REVIEW**

¶18. When an accused raises a speedy trial violation before the circuit court, the judge must consider the questions of "whether there was 'good cause' for a delay" and whether "the defendant has been prejudiced by any delay." *Berryman v. State*, 337 So. 3d 1116, 1127 (¶33) (Miss. Ct. App. 2021) (citing *State v. Woodall*, 801 So. 2d 678, 680-81, 687 (¶¶7, 29, 31)

6

(Miss. 2001)).  We will affirm the circuit court's findings on good cause and prejudice, if they are supported by substantial credible evidence. *Id*.

¶19.    In addition, "[j]ury instructions are within the discretion of the circuit court[,] and the settled standard of review is abuse of discretion." *Blanden v. State*, 276 So. 3d 1204, 1210 (¶21) (Miss. Ct. App. 2018).

**DISCUSSION**

¶20.    Brandon received a fair trial.  Although Brandon raises (1) that the circuit court's *Barker v. Wingo*[2] speedy-trial analysis was clearly erroneous and (2) that his heat-of-passion jury instruction should have been given, we conclude that Brandon's speedy trial right was not violated and that the circuit court did not abuse its discretion by refusing Brandon's heat-of-passion jury instruction.  Therefore, we affirm Brandon's conviction and sentence.

**I.    Constitutional Right to a Speedy Trial**

¶21.    "The Sixth Amendment to the United States Constitution states, in pertinent part, that 'the accused shall enjoy the right to a speedy and public trial.'" *Havard v. State*, 94 So. 3d 229, 236 (¶16) (Miss. 2012); *accord Klopfer v. North Carolina*, 386 U.S. 213, 223-26 (1967) (applying right to the states).  Article 3, Section 26 of the Mississippi Constitution of 1890 likewise guarantees a criminal defendant the right to "a speedy and public trial . . . ." Miss. Const. art. 3, § 26.  "A formal indictment or information or an arrest—whichever first

---

[2] *Barker v. Wingo*, 407 U.S. 514 (1972).  The *Barker* analysis applies only to an accused's assertion that his constitutional speedy trial right has been violated.  *Guice v. State*, 952 So. 2d 129, 139 (¶39) (Miss. 2007).  Moreover, Brandon does not raise his statutory right to a speedy trial as an issue on appeal. Miss. Code Ann. § 99-17-1 (Rev. 2020).

occurs—triggers the constitutional right to a speedy trial." *McBride v. State*, 61 So. 3d 138, 142 (¶8) (Miss. 2011); *United States v. Marion*, 404 U.S. 307, 320 (1971); *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989) (citing *Perry v. State*, 419 So. 2d 194, 198 (Miss. 1982)).

¶22.    Brandon was arrested on November 20, 2018.  Fourteen months later, Brandon had not received a bill of information or indictment.  On January 24, 2020, Brandon filed a motion to dismiss for lack of speedy trial and to reduce bail.  The circuit court denied Brandon's motion to dismiss.  Brandon argues the circuit court erroneously applied the law.

¶23.    When reviewing a speedy trial claim, this Court applies a four-part test.  In *Barker*, 407 U.S. at 530, our United States Supreme Court announced a four-factored balancing test to determine whether an accused has been denied his speedy trial right: (1) length of delay, (2) reason for delay, (3) assertion of the right, and (4) prejudice to the defendant.

### (1)    Length of Delay

¶24.    "The length of delay is to some extent a triggering mechanism." *Id*. "A full *Barker* analysis is warranted only if the delay was presumptively prejudicial." *McBride*, 61 So. 3d at 142 (¶7); *accord Stark v. State*, 911 So. 2d 447, 450 (¶9) (Miss. 2005) (citing *Barker*, 407 U.S. at 530). "In Mississippi, a delay of more than eight months is presumptively prejudicial." *Stark*, 911 So. 2d at 450 (¶9) (citing *Smith*, 550 So. 2d at 408).

¶25.    When the circuit judge analyzed the length-of-delay factor, she said:

> Now, the Court looks at the length of fifteen months. While fifteen months may seem like a long, long time, but in the eyes of the law, it's not that long. It's just fifteen months. So, the State wins that one.

¶26.    We disagree.  In this instance, Brandon was arrested on November 19, 2018.  On

8

January 24, 2020, Brandon filed a motion to dismiss for lack of speedy trial and other relief. At the hearing on the motion to dismiss, fifteen months had elapsed since Brandon's arrest. Thus, Brandon was presumptively prejudiced. This factor weighed against the State. Because the delay was presumptively prejudicial, we turn to the remaining three factors.

### (2) Reason for Delay

¶27. "When the length of the delay is presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay." *Bateman v. State*, 125 So. 3d 616, 629 (¶45) (Miss. 2013). "Different reasons for delay are assigned different weights." *Barker*, 407 U.S. at 532. "Deliberate attempt[s] to delay the trial in order to hamper the defense [are] weigh[ed] heavily against the government." *Id.* at 531. Whereas "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily . . . ." *Id.*

¶28. Basically, "the State must prove either that the defendant prompted the delay or that the State had good cause." *De La Beckwith v. State*, 707 So. 2d 547, 606 (Miss. 1997), *distinguished on other grounds by Wharton v. State*, 734 So. 2d 985, 991 (¶23) (Miss. 1998). And when the circuit judge has found good cause for the delay, the finding "will be left undisturbed where there is in the record substantial credible evidence from which it could have been made." *Walton v. State*, 678 So. 2d 645, 648-49 (Miss. 1996); *accord McNeal v. State*, 617 So. 2d 999, 1007 (Miss. 1993); *Folk v. State*, 576 So. 2d 1243, 1247 (Miss. 1991).

¶29. The burden shifted to the State to give cause for the delay between November 20, 2018, and January 24, 2020. The State explained that it was waiting on the autopsy report because as a matter of policy, the administration did not allow for the prosecution to indict

defendants without a report. *See Harris v. State*, 311 So. 3d 638, 665 (¶80) (Miss. Ct. App. 2020) (explaining that prosecutors cannot pursue an indictment "until they have probable cause to believe an accused is guilty," and stating, "indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause"); *Woodall*, 801 So. 2d at 682 (¶15).

¶30.    But the State failed to provide any documentation in support of its inability to obtain an autopsy report from the Mississippi Crime Laboratory.  The State did not provide any dates as to when the autopsy report was originally due or any correspondence from the crime lab indicating that the crime lab caused the delay.

¶31.    In *Galloway v. State*, 122 So. 3d 614, 650 (¶104) (Miss. 2013), the State blamed the crime lab for the delay in presenting the case to the grand jury.  In that case, the State provided an invoice from the crime lab for support. *Galloway*, 122 So. 3d at 650 (¶104). Here, however, we do not have any documentation or evidence to support the State's assertion. Thus, the record lacks credible evidence for the circuit judge to have found good cause for delay on this point. *See id.* (citing *Flora v. State*, 925 So. 2d 797 (Miss. 2006)) (stating "the importance of making a clear record to allow proper review of speedy-trial claims").

¶32.    The State did not provide any further reason for delay.  And yet, the circuit judge concluded that:

> [W]hen we talk about the previous administration, this Court is aware that the previous District of Attorney, from August, and even before that to January, just shutdown, did nothing. The new administration couldn't do anything before January. This is the very beginning of February. I know they've been

10

busy. So, I can't - - the State would have to win that one. I can't count all of this against the State.

Presumably the circuit judge was relying on what the defendant's attorney said when he acknowledged that "it [was] definitely not the current District Attorney's fault, because we have a new DA." But the State has the burden of persuasion on this factor, *Graham v. State*, 185 So. 3d 992, 1006 (¶42) (Miss. 2016), and the State did not assert the change in administration as cause for its delay. Thus, we conclude that the circuit judge erred by basing its finding of good cause on reasons not provided by the State.

¶33. Even if the State had cited the change in administration as an explanation for delay, this circumstance would not have resulted in a finding of good cause that was supported by substantial credible evidence. Unlike an overcrowding docket and an understaffed office, *Bailey v. State*, 463 So. 2d 1059, 1062 (Miss. 1985), the complete shutdown of the district attorney's office is more akin to an intentional and blatant decision to frustrate the criminal justice process, than the former scenarios, which in large part are out of the State's control. Because the accused remains "in the custody of" the State, the State has the ultimate responsibility of bringing the accused to trial. *Barker*, 407 U.S. at 527 ("A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process."). The State cannot skirt responsibility by placing blame on the previous administration. *See Vickery v. State*, 535 So. 2d 1371, 1377 (Miss. 1988). This factor weighed against the State.

### (3) Assertion of the Right

¶34. Our Supreme Court "has stressed the importance of a defendant's request for a speedy

trial." *Perry*, 419 So. 2d at 199.  The Supreme Court has "repeatedly held that a defendant's failure to assert his right to a speedy trial must be weighed against him." *Young v. State*, 891 So. 2d 813, 818 (¶13) (Miss. 2005) (citing *Watts v. State*, 733 So. 2d 214, 236 (Miss. 1999)). But "[w]hether and how a defendant asserts his right is closely related to the other factors . . . ." *Barker*, 407 U.S. at 531.

¶35.  The circuit judge found that Brandon asserted his right to a speedy trial, and substantial credible evidence supports this finding.  Brandon filed a motion to dismiss, asserting his speedy trial right.  *See Galloway*, 122 So. 3d at 649 (¶¶100, 105); *see also Collins. v. Miss. Dep't. of Corr.*, No. 2:18-cv-46-TBM-RPM, 2021 WL 4330974 at *13 (S.D. Miss. Aug. 3, 2021).  In the motion, Brandon stated that he made a demand for a speedy trial during the preliminary hearing.

¶36.  There are no written documents in the record showing that Brandon asserted his right at the preliminary hearing.  Although a written demand would have given more credibility to this assertion, a written demand was not required.  *State v. Ferguson*, 576 So. 2d 1242, 1254 (Miss. 1991), *overruled in part on other grounds by Johnson v. State*, 68 So. 3d 1239, 1243 (¶11) (Miss. 2011).  This factor weighed slightly in Brandon's favor.

### (4)    Prejudice

¶37.  "To determine whether the delay resulted in actual prejudice, the Court considers three interests that the right to a speedy trial was meant to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Taylor v. State*, 162 So. 3d 780, 787 (¶16)

(Miss. 2015) (quoting *Jenkins v. State*, 947 So. 2d 270, 277 (¶21) (Miss. 2006); *Barker*, 407 U.S. at 532)). "Of these three interests, the last is the most important; and when violated, [it is] most prejudicial to the defendant." *Collins v. State*, 232 So. 3d 739, 746 (¶26) (Miss. Ct. App. 2017) (quoting *Hersick v. State*, 904 So. 2d 116, 123 (¶18) (Miss. 2004)).

¶38. "Generally, proof of prejudice entails the loss of evidence, death of witnesses, or staleness of an investigation." *McCormick v. State*, 183 So. 3d 898, 903 (¶21) (Miss. Ct. App. 2015) (quoting *Sharp v. State*, 786 So. 2d 372, 381(¶19) (Miss. 2001)). The defendant "bears the burden of showing actual prejudice, since the defendant is clearly in the best position to show prejudice under this prong." *Reed v. State*, 191 So. 3d 134, 141 (¶19) (Miss. Ct. App. 2016) (internal quotation marks omitted).

¶39. In Brandon's motion to dismiss, Brandon asserted that the delay in his trial prejudiced him because it impacted his life and health, caused him anxiety, and caused him to lose his employment. Brandon stood on his motion at the hearing. Brandon requested the circuit judge to either reduce his bond or order the State to present his case at the next grand jury. The circuit judge ruled that

> [she] [did not] see any prejudice at this particular point of lost witnesses, things that would hurt his case, or anything of that nature. So the Court is not going to dismiss the case. I believe that's sufficient.

¶40. Undoubtedly, pre-trial detention deprives the accused, who is innocent until proven guilty, of liberty for an indefinite amount of time. And after an extended period, the prolonged detention brings about certain collateral consequences. Yet, in this instance, Brandon has failed to articulate with any degree of specificity how his fifteen-month delay

13

impaired his defense, which is the most important consideration. Brandon has not argued

that he lost evidence or witnesses during the delay. Although Brandon asserted that the delay

caused him anxiety, "[s]ome degree of anxiety exists for every defendant . . . ." *McBride*,

61 So. 3d at 147 (¶31). This factor weighed against Brandon.

¶41. Thus, when reviewing the circumstances in totality, we affirm the circuit court's

ruling that Brandon's constitutional right to a speedy trial was not violated. We acknowledge

the circuit judge's error by both finding that the length of delay was meaningless and by

finding good cause for the State's delay, but affirm the ruling because Brandon failed to

provide evidence of actual prejudice during his fifteen-month delay.

## II. Heat-of-Passion Jury Instruction

¶42. Brandon also argues that the trial court erred by refusing his proposed jury instruction

on heat-of-passion manslaughter. Brandon claims that the court denied him the opportunity

to present his defense and that the evidence supported giving the instruction.

¶43. Brandon's counsel presented the following heat-of-passion jury instruction to the

court:

> If you find that the State has failed to prove any one or more of the essential
> elements of the crime charged, you must find the defendant not guilty of the
> charge. You will then proceed with your deliberations to decide whether the
> State has proved beyond a reasonable doubt all of the elements of the lesser
> included crime of Manslaughter: Heat of Passion. If you find from all of the
> evidence in this case beyond a reasonable doubt that:
>
> 1. The deceased, Mirrander McClain was a living person;
>
> 2. The Defendant, Brandon DeJohnette, did kill Mirrander McClain
>
> 3. Without malice;

14

4. In the Heat of Passion;

5. But in a cruel or unusual manner, or by the use of a dangerous weapon not in necessary self defense and without the authority of law,

Then you shall find the Defendant guilty of Manslaughter. [The lesser included crime contains the same elements as the crime charged, with the exceptions of without Malice and in The Heat of Passion.]

During the jury instruction conference, the State reasoned that the evidence did not support giving the instruction. Because Brandon did not testify at his trial, the circuit judge was left to consider Brandon's police statement. The circuit judge explained that "[Brandon] was asked repeatedly, 'What provoked you?' What caused you - - and he never said anything; nothing. He just - - he would mumble and say other things, but he didn't say it was her hitting me beside the head that provoked him into doing [it]." As a result, the circuit court refused the heat-of-passion jury instruction, finding that there was no evidence to support it.

¶44. In Mississippi, "a defendant is entitled to have jury instructions given which present his theory of the case. This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Westbrook v. State*, 29 So. 3d 828, 835 (¶25) (Miss. Ct. App. 2009) (citing *Wallace v. State*, 10 So. 3d 913, 916 (¶9) (Miss. 2009)).

¶45. "[D]enial of a manslaughter instruction is proper where the record is clear that the decedent was [killed] with malice or deliberate design." *Abeyta v. State*, 137 So. 3d 305, 311 (¶12) (Miss. 2014) (quoting *Simmons v. State*, 805 So. 2d 452, 474 (¶32) (Miss. 2001)). "When a deadly weapon is used, as here, malice is implied." *Turner v. State*, 773 So. 2d 952,

15

954 (¶7) (Miss. Ct. App. 2007). "In order to overcome that implication, there must be some evidence in the record from which the jury could determine that the act was not the result of malice, but a result of heat of passion." *Id.*

¶46.    "The trial court must grant a lesser-included-offense instruction unless the trial judge—and ultimately this Court—can say, considering the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the accused, that no reasonable jury could find the defendant guilty of the lesser-included offense." *Abeyta*, 137 So. 3d at 310 at (¶9). Heat-of-passion manslaughter, which is a lesser-included-offense, is defined as

> a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Westbrook*, 29 So. 3d at 835 (¶26) (quoting *McCune v. State*, 989 So. 3d 310, 319 (¶15) (Miss. 2008)). "Each case must depend upon its own facts and circumstances." *Wade v. State*, 724 So. 2d 1007, 1011 (¶13) (Miss. Ct. App. 1998), *aff'd*, 748 So. 2d 771, 777 (¶21) (Miss. 1999). However, the heat-of-passion standard is not subjective. The response must be the result of "some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Abeyta*, 137 So. 3d at 310 (¶10) (quoting *Agnew v. State*, 783 So. 2d 699, 703 (¶14) (Miss. 2001)). "[W]ords alone . . . are not enough to invoke the passion required for manslaughter." *Holmes v. State*, 201 So. 3d 491, 494 (¶12) (Miss. 2015) (citations omitted). Instead, the

16

provocation must be some act that "usurps the mind destroying judgment." *Sanders v. State*, 103 So. 3d 775, 778 (¶11) (Miss. Ct. App. 2012) (quoting *Agnew*, 783 So. 2d at 703-04 (¶14)). In general, physical acts like "pushing or shoving" are "insufficient to require the instruction absent testimony that the defendant was acting out of violence or uncontrollable rage." *Cooper v. State*, 977 So. 2d 1220, 1223 (¶11) (Miss. Ct. App. 2007); *see, e.g.*, *Moffett v. State*, 354 So. 3d 929, 934, 940 (¶¶4, 29-30) (Miss. Ct. App. 2022).

¶47. In a preceding case, a day-long argument had occurred between Cordaeil Miller and Jonicqua Moffett, which resulted in Moffett stabbing Miller in the heart with a knife. *Moffett*, 354 So. 3d at 933 (¶2). Moffett claimed that the argument occurred because she saw Miller, her fiancé, with another woman. *Id.* at 935 (¶8). Moffett had told the police officers that Miller had been intoxicated and verbally abusive. *Id.* at 934 (¶4). When Miller tried to leave the argument, Moffett tried to stop him. *Id.* Miller turned and "struck her in the mouth with his elbow." *Id.* Moffett further alleged that when Miller attempted to hug her, she "'accidentally' stabbed" him. *Id.* Moffett later testified that during the argument she decided to walk away from Miller. *Id.* at (¶29). She then went inside the house to retrieve the knife and came back outside to continue arguing. *Id.* This Court held that Moffett's actions did not evidence a state of violent or uncontrollable rage and that the court did not err by refusing the heat-of-passion jury instruction. *Id.* at (¶30); *accord Cooper*, 977 So. 2d at 1223 (¶11).

¶48. Here, Brandon came over to Mirrander's house hours after having a phone conversation with her, and he suspected or accused Mirrander of cheating. While on Mirrander's porch, the argument continued. Brandon claimed that Mirrander had hit him on

17

the head. The confrontation ended with Brandon shooting Mirrander five times. Brandon claimed he tried to leave, but Mirrander stopped him. Brandon also claimed he did not usually carry a firearm but had done so on that day to protect himself. Brandon further claimed that in the past Mirrander had pulled a gun on him. Although it is disputed whether Mirrander hit Brandon on the head, and if so, whether this was the act that provoked Brandon to shoot Mirrander, we must make all reasonable inferences in favor of the accused. *Abeyta*, 137 So. 3d at 310 (¶9). Thus, we will presume, without deciding, that Mirrander hit Brandon on the head.

¶49. Brandon used a firearm (a deadly weapon) to kill Mirrander. Therefore, there is an implication of malice. *Turner*, 773 So. 2d at 954 (¶7). Without evidence to the contrary, a heat-of-passion jury instruction was unwarranted. *Id*. Given that there is no evidence in the record contradicting malice, the circuit court did not err by refusing to give the instruction. As in *Moffett*, the record here shows a victim and a defendant having a verbal argument that resulted in some physical actions. But this evidence is not sufficient to overcome the presumption of malice. *See Cooper*, 977 So. 2d at 1223 (¶11). The record also does not contain any testimony from Brandon or anyone else to indicate that Brandon was so enraged by Mirrander's hit that he shot her in a heat of passion. The evidence indicates, instead, that Brandon, having stated that he did not usually carry a firearm, planned to use the weapon after having the in-text argument.

¶50. Nor does the fact that Mirrander may have pulled a gun on Brandon before that night warrant a heat-of-passion instruction. Past acts are rarely sufficient to warrant giving a

18

heat-of-passion jury instruction because heat-of-passion requires immediacy, absent a cooling-off period "between the provocation and the killing." *Sanders*, 103 So. 3d at 779 (¶13) (citing *Smith v. State*, 76 So. 3d 170, 173 (¶12) (Miss. Ct. App. 2009); *Alford v. State*, 5 So. 3d 1138, 1143 (¶17) (Miss. Ct. App. 2008)); *but see Wade v. State*, 748 So. 2d 771, 777 (¶15) (Miss. 1999) (finding past acts sufficient because victim had displayed a "prolonged history of violence"). If Mirrander pulled a gun on Brandon prior to the night of the murder, this act is insufficient to serve as Brandon's provocation because it lacked immediacy. *See Sanders*, 103 So. 3d at 779 (¶13); *Smith*, 76 So. 3d at 173 (¶12). We affirm the circuit court's ruling.

## CONCLUSION

¶51. We affirm Brandon's conviction and sentence. Brandon's constitutional right to a speedy trial was not violated, and the circuit judge did not abuse her discretion by refusing his heat-of-passion jury instruction.

¶52. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE AND McDONALD, JJ., CONCUR. WILSON, P.J., McCARTY AND EMFINGER, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE AND SMITH, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**